UNITED STATES DISTRICT EXH. RN
DISTRICT OF NEW YORK

| | |
|---|---|
| **MARILYN COLLINS, et al.,** | **PLAINTIFFS' AFFIRMATIVE STATEMENT OF FACTS PURSUANT TO LOCAL CIVIL RULE 56.1** |
| **Plaintiffs,** | |
| **-v-** | |
| **THE CITY OF NEW YORK, et al.,** | |
| **Defendants.** | **Index No. 14 CV 8815 (AJN)(BCM)** |

## PLAINTIFFS' AFFIRMATIVE STATEMENT OF FACTS PURSUANT TO LOCAL CIVIL RULE 56.1

Plaintiffs submit this statement pursuant to Rule 56.1 of the Local Civil Rules of the United States District Court for the Southern District of New York.

### Occupy Wall Street and the November 5, 2011 Bank Transfer Day

1. Occupy Wall Street ("OWS") was a movement "to bring to the attention of the people in this country the gross inequities in the system and in the economy." Heinz Dep. 19:23- 20:1; A. Weisenhaus Dep. 10:24-11:2.

2. November 5, 2011 was a Saturday. See https://www.timeanddate.com/calendar/monthly.html?year=2011&month=11; Anger Dep. 34:7-9.

3. November 5, 2011, was OWS "Bank Transfer Day." Shirazi Dep. 21:6-14.

4. The goal of Bank Transfer Day was "a day to bring to the attention of the public . . . the effect that what the banks do, the effect that it has on people, on people's lives and putting out a suggestion that people move the money from the big banks to credit unions where it is a much fairer method." Shirazi Dep. 21:6-14.

## Plaintiffs

**Plaintiff Ann Shirazi**

5. On November 5, 2011, Plaintiff ANN SHIRAZI was 57 years old, around 5'4" tall, and weighed around 140 pounds. Shirazi OLBS at p. 1[1].

6. Plaintiff Shirazi wore a yellow tunic over other clothing with the words "Granny Peace Brigade" on it on November 5, 2011. Shirazi Dep: 23:14-16. The "Granny Peace Brigade" is a group of women over 50 years of age, who have come together from different peace-oriented groups to work in the cause of justice. Shirazi Dep. 19:22- 20:14.

**Plaintiff Jenny Heinz**

7. Plaintiff JENNY HEINZ is also a member of the Granny Peace Brigade. Heinz Dep. 11:5-6.

8. Plaintiff Heinz has been a member of the Granny Peace Brigade since its inception in 2004 or 2005, and is one of its original members. Heinz Dep. 11:8-13.

9. Plaintiff Heinz wore a yellow tunic (like Plaintiff Shirazi's) over her clothing with the words "Granny Peace Brigade" on it on November 5, 2011. Shirazi Dep: 23:18-22.

10. Plaintiff Heinz attended the events on November 5, 2011 "to be part of a protest that [she] believed in." Heinz Dep. 20: 20-21.

**Plaintiffs Marilyn Collins and Betsy LaPenne**

11. On November 5, 2011, Plaintiff MARILYN COLLINS went to Zuccotti Park and met her friend Plaintiff BETSY LAPENNE in order to participate in Bank Transfer Day. LaPenne Dep. 12:12-18, 13:7-10, 14:8-16; Collins Dep. 22:24-23:6.

---

[1]   Throughout, Plaintiffs adopt the styles of referring to documents set forth in the February 13, 2017 Declaration of Gideon Orion Oliver in Opposition to Defendants' Summary Judgment Motion (the "Oliver Decl.").

12. Plaintiff LaPenne intended to "exercise[e her] First Amendment rights" on November 5, 2011. LaPenne Dep. 25:17-19.

**Plaintiffs Chloe Weisenhaus and Asya Weisenhaus**

13. Plaintiffs ASYA WEISENHAUS and CHLOE WEISENHAUS are sisters, and they attended the November 5, 2011 Bank Transfer Day with their younger sister, Maya, a non-party. A. Weisenhaus Dep. 8:22-9:2, 18:20-23.

14. The Weisenhaus sisters participated in the protests on November 5, 2011 because they wanted to be involved in OWS, and wanted to talk to people involved and hear their opinions.  A. Weisenhaus Dep. 9:13-17.

**Plaintiff Emilou MacLean**

15. At the time of her arrest on November 5, 2011, Plaintiff Maclean was acting as a volunteer Legal Observer with the National Lawyers Guild - New York City Chapter, and was wearing a bright green hat and badge identifying her as such. Maclean Dep. 33:21-22; 52:11-14.

16. Plaintiff MacLean described her role as a Legal Observer "to be an observer of the protests. . .To monitor the police response to protests in support of either criminal defense or potential legal challenges" and "as part of a broader effort to deter . . . unlawful or abusive conduct, by police, in response to protests." MacLean Dep. 48:1-6.

17. As a Legal Observer, Plaintiff MacLean tried deter police abuse "by being present and highly visible as a legal observer," including by consistently wearing a fluorescent green hat that said "National Lawyers Guild - Legal Observer" and a badge that had her name and said legal observer. MacLean Dep. 52:5-14.

18. As a Legal Observer, Plaintiff MacLean also stood apart from demonstrations, by

physically standing outside the group of people protesting in order to best witness what was occurring.  MacLean Dep. 52:15-54:5.

19.   As a Legal Observer, Plaintiff MacLean observed and documented potentially unconstitutional or illegal behavior by police officers, including police response to protests, with the goal to minimize such unconstitutional or illegal behavior. MacLean Dep. 54:25-56:8.

20.   In response to the phone call on the afternoon of November 5, 2011 stating that arrests had occurred at Foley Square, Plaintiff MacLean went to Foley Square to act as a Legal Observer of the protests and arrests, by documenting, witnessing and observing what was taking place, with her Legal Observer hat and badge. MacLean Dep. 57:3-7; 59:11-22; 90:17-18.

21.   When Plaintiff MacLean arrived in the Foley Square area, she was wearing her Legal Observer hat and badge and they were visible. MacLean Dep. 67:6-10.

22.   The NYPD Patrol Guide in effect at the time of Plaintiff MacLean's arrest recognized the rights of Legal Observers and others to observe and bystand at the scene of police arrest activities. Oliver Decl. Paras. 78-89 and Exhs. 63-69.

### The November 5, 2011 Bank Transfer Day Gathering and March

23.   Bank Transfer Day involved an informational event with literature at Zuccotti Park, followed by a march to the area of Foley Square. LaPenne Dep. 12:12-18, 13:7-10; Collins 22:24-23:11, 23:23-24:9.

24.   Plaintiffs Shirazi, LaPenne, Collins, Heinz, and C. Weisenhaus participated in the march from Zuccotti Park to Foley Square. Shirazi Dep: 27:20-28:8; LaPenne Dep. 12:12-18, 13:7-10; Collins Dep. 23:23-24:9; Heinz Dep. 20:17-19; C. Weisenhaus Dep. 19:3-5.

25.   Numerous Defendants and other NYPD officers escorted and facilitated OWS protesters on the march. Anger Dep. 29:6-30:21; Anger *Wiles* Dep. 73:4-18; McNamara *Wiles* Dep. 19:12-21:23.

26.   Several Plaintiffs characterized the march as peaceful, and as successful in communicating about issues of economic inequality. Heinz Dep. 20:17-19; C. Weisenhaus Dep. 17:17-22.

27.   C. Weisenhaus characterized those events on November 5, 2011 as "a large and peaceful protest" with "a lot of people as well as police officers that were keeping everything organized and peaceful and we were just spreading awareness and slowly marching." C. Weisenhaus Dep. 17:17-22.

28.   On the march to Foley Square, C. Weisenhaus observed very positive interactions between police officers and protesters, and C. Weisenhaus had a small talk with an officer about something positive or funny. C. Weisenhaus Dep. 21:3-7.

### The March's Arrival in the 60 Centre Street Area

29.   The OWS demonstrators and their police escort arrived in the area of 60 Centre Street at around a little before 3 p.m. *See, e.g.,* Exh. U-1 at 0:00 (2:56:07).

30.   Defendant Anger was the NYPD Incident Commander in the area of 60 Centre Street on November 5, 2011. Anger Dep. Wiles 54:9-11; Oliver Decl. Paras. 84-85, Exh. 66.

31.   Defendant Anger was the highest-ranking person at the scene in the vicinity of 60 Centre Street on November 5, 2011, and Defendant Anger did not report to any one else. Anger *Wiles* Dep. 56:21-57:11.

32.   As Incident Commander, Anger oversaw the deployment of officers around 60 Centre Street, based on his assessment of the situation.  Anger *Wiles* Dep. 54:13-25.

33.   As Incident Commander, Anger decided where officers should stand and when they should form police lines. Anger *Wiles* Dep. 55:11-20.

34.   Defendant Anger did not know if the Courthouse at 60 Centre Street was open on Saturdays. Anger Dep. 70:4-5.

35.   When the demonstrators arrived in Foley Square, some demonstrators wanted to use the steps of the courthouse at 60 Centre Street for a rally. McNamara *Wiles* Dep. 26:25–27:13; *Wiles v. City of New York, et al.*, 13-cv-2898 (TPG), 2016 WL 6238609, at *1 (SDNY Oct. 25, 2016) ("the protesters wanted to use these steps [leading up to …[the] entrance" to "the New York Supreme Court building located at 60 Centre Street, across the street from Foley Square").

36.   At first, police prevented the demonstrators from rallying on the courthouse steps by issuing verbal instructions and by staging a few police officers on the steps, and the demonstrators did not go up onto the steps. McNamara *Wiles* Dep. 27:9–28:24; Anger *Wiles* Dep. 78:6-11.

**Physical Layout of 60 Centre Street, 40 Foley Square, and Foley Square**

37.   The New York County Supreme Court building is located at 60 Centre Street, on the east side of Centre Street between Worth Street (toward the north) and Pearl Street (toward the south). Decker Decl. 6.

38.   Centre Street between Worth Street and the Pearl Street alley is approximately 290 feet long, measured curb-to-curb (north to south) (such block, the "60 Centre Street Block"). Decker Decl. 7.

39.   The perimeter of the steps at the base 60 Centre Street, measured across the widest point of the steps, is approximately 128 feet. Decker Decl. 8.

40. From the center point at the base of the 60 Centre Street steps, it is approximately (i) 32 feet to the Centre Street curb (toward the west), (ii) 86 feet to the U.S. Marshall Service vehicle barricade in the Pearl Street alley (toward the south), and (iii) 228 feet to the Worth Street curb (toward the north). Decker Decl. 9.

41. From the northern edge at the base of the 60 Centre St steps, it is approximately (i) 28 feet to the Centre Street curb (toward the west), and (ii) 170 feet to the Worth Street curb (toward the north). Decker Decl. 10.

42. From the southern edge at the base of the 60 Centre Street steps, it is approximately (i) 41 feet to the Centre Street curb (toward the west), and (ii) 34 feet to the U.S. Marshall Service vehicle barricade in the Pearl Street alley (toward the south). Decker Decl. 11.

43. In front of 60 Centre Street is Centre Street, a four-lane roadway comprised of three vehicular traffic lanes on the left and one buffered bike lane on the right. Decker Decl. 12.

44. The Centre Street bike lane is protected from the vehicular traffic lanes by regularly spaced orange barrels that are placed approximately 11 feet curbs in front of 60 Centre Street and the Thurgood Marshall United States Courthouse. Decker Decl. 13.

45. On November 5, 2011, the Centre Street bike lane was protected from the vehicular traffic lanes by regularly spaced orange barrels. Decker Decl. 14.

46. The area referred to as the "Pearl Street Alley" is the paved portion of Pearl Street alley that is west of the U.S. Marshall Service vehicle barricade. Decker Decl. 15.

47. The U.S. Marshall Service vehicle barricade (the "sally port") sits across Pearl Street (north-to-south), and is approximately 40 feet from Centre Street's right vehicle lane.

48.  The alley is approximately 37 feet across, measured curb-to-curb at the crosswalk parallel to Centre Street (north to south). Decker Decl. 17.

49.  The Thurgood Marshall U.S. Courthouse is located at 40 Foley Square, on the east side of Centre Street between Pearl Street to the north and the intersection of Reade Street to the south. Decker Decl. 18.

50.  Centre Street between Pearl Street and the intersection of Reade Street is approximately 340 feet long, curb-to-curb (north to south) (such block, the "Thurgood Marsshall United States Courthouse Block"). Decker Decl. 19.

51.  From the northern edge of the Thurgood Marshall U.S. Courthouse, it is approximately 40 feet to the Centre Street curb (toward the west). Decker Decl. 20.

52.  On November 5, 2011, the Thurgood Marshall U.S. Courthouse was under renovation, with fencing covering the entire length of the steps. Decker Decl. 21.

53.  The point on Centre Street that is perpendicular to the space between the two northernmost columns on the Thurgood Marshall U.S. Courthouse façade is (i) approximately 64 feet from such columns, (ii) approximately 40 feet from the corner of Centre Street and Pearl Street, and (iii) approximately 67 feet to the space east of the U.S. Marshall Service booth. Decker Decl. 22.

54.  The triangular public park bounded by Centre Street (toward the east), Worth Street (toward the north), and Lafayette Street (toward the south) is commonly referred to as "Foley Square." Decker Decl. 23.

**EVENTS NEAR 60 CENTRE STREET – NOVEMBER 5, 2011 AROUND 2:55pm**

55.   When the main police video depicting events from November 5, 2011 begins, the
      footage shows NYPD officers temporarily blocking vehicular traffic from flowing on
      Centre Street. Exh. U-1[2], 0:00 (2:56:07) – 0:47[3] (2:56:52).

56.   After those first 47 seconds and for the next approximately 9 minutes, the video
      shows at least 81 vehicles moving on Centre Street through the intersection at Pearl
      Street, without obstruction from demonstrators, being directed by uniformed NYPD
      officers, including throughout Plaintiffs' arrests. *See* February 13, 2017 Declaration of
      Michael J. Decker ("Decker Decl.") Paras. 29-37.

57.   Video shows that between around 2:55pm and 3:02pm, OWS protesters continued
      their demonstration on the sidewalk in front of the courthouse at 60 Centre Street,
      including by gathering, chanting, and holding political signs and puppets. Exh. U-1,
      0:00 – 4:18 (2:56:07-3:02:21).

58.   Video shows between around 2:55pm and 3:02pm, around 25 vehicles moving on
      Centre Street through the intersection at Pearl Street, without obstruction from
      demonstrators. Exh. U-1, 0:00 – 4:18 (2:56:07-3:02:21).

59.   At around that time, Defendant Anger ordered subordinate officers, including
      Defendant Zielinski, to make an announcement to people on the sidewalk "that they
      were obstructing the sidewalk, they were violating disorderly conduct and asked
      them to leave the area or they'd be subject to arrest." Anger *Wiles* Dep. 93:23-94:10;
      Zielinski *Wiles* Dep. 74:19-75:16.

---

[2]    The videos referred to throughout adopt the styles of references from December 15,
2016 Declaration of Joy Anakhu in Support of Defendants' Motion for Summary Judgment
(Dkt. No. 70), except that "U-1" refers to the first video file on Exh. U and "U-2" refers to
the second.
[3]    Where possible, Plaintiffs have noted both the times on the digital footage ("0:00-
0:30") being referred to and the timestamp indicated on the image on the screen (i.e.,
"3:00:00").

60. Defendant Anger testified that he decided to order the sidewalk cleared because the sidewalk was "being obstructed and people had to walk in the roadway," because he was concerned about the safety of the courthouse" and because "traffic was trying to get by." Anger Dep. 69:17- 70:16.

61. Defendant Zielinski testified that the conduct the people were engaging in that justified these orders were that the protesters "were loud, they were boisterous, they were refusing to let the general public proceed on a sidewalk" and because "[t]he general public had to proceed on the street where there was vehicle traffic there posing a danger." Zielinski *Wiles* Dep. 76:22-77:

62. Defendant Zielinski testified that he directed people to vacate the area, but did not direct persons where to go. Zielinski *Wiles* Dep. 107:4-7.

63. Speaking from the steps of 60 Centre Street, an officer stated via a bullhorn: "You got to keep it moving. You've got to get off of this sidewalk. Ladies and gentlemen, you have to move you cannot stand here, you cannot stand here, you will be subject to arrest if you don't keep it moving. Folks you've got to keep moving. Ladies and gentlemen, you've got to keep this area clear. Ladies and gentlemen, can you clear this area? You've got to keep it moving. Ladies and gentlemen, you've got to clear this area." Exh. U-1, 4:18-5:25 (3:02:22-3:03:29).

64. After reviewing the above-cited section of video, Lieutenant Zielinski admitted that the protestors were not committing disorderly conduct prior to or when police gave those directions. Zielinski *Wiles* Dep. 173:3-12; Video U-1 00:00 - 05:34.

### The Arrest of Joshua Wiles

65. Approximately 20 seconds after those directions, some protesters, including Joshua Wiles, said or chanted "We want the steps" for about a total of one minute. Exh. U-

10

1, 5:57-6:23.

66. Defendant Zielinski testified that it was not illegal to so chant "We want the steps." Zielinski *Wiles* Dep. 173:20-25.

67. During two depositions at which he was questioned about whether Joshua Wiles or anyone chanted "Take the steps" at that time and location, in connection with which he reviewed the Morales video, Defendant Anger admitted that no person could be heard saying "Take the steps" on the video. Anger *Wiles* Dep. 41:9-44:14, 51:14-54:8; Anger Dep. 53:5-58:6.

68. When Joshua Wiles chanted "We want the steps," he was standing directly in front of the police line that was stretched across the base of the steps of 60 Centre Street, near to the officer who had directed people to move from that area. Exhibit U-1, 5:56-6:20.

69. Joshua Wiles was subsequently arrested and charged with Disorderly Conduct. Oliver Decl. Exh. 61.

70. Later in the afternoon of November 5, 2011, after arresting Mr. Wiles, Officer McNamara arrested a male in Foley Square Park. MacNamara Dep. 71:22-76:5.

71. NYPD Officer McNamara later swore out an accusatory instrument charging that male non-party with Inciting to Riot and Obstruction of Governmental Administration in the Second Degree based on his allegedly having "repeatedly shout[ed]" the words "TAKE THE STEPS" thereby inciting others to push up against mesh barrier netting. Oliver Decl. Exh. 62.

72. The NYPD's "Unusual Occurrence Report" regarding the November 5, 2011 incident in connection with which Plaintiffs were arrested, reflects that 16 arrests were made at Foley Square. Oliver Decl. Exh. 55.

73.   At around 3:04pm, approximately one minute after the end of the officer's first
direction at around 3:03:29pm, Defendant Zielinski, while on the steps of 60 Centre
Street, stated via a bullhorn (apparently reading from a script): "Ladies and
gentlemen my name is Lt. Zielinski, I am with the Manhattan South Task Force, you
are blocking pedestrian traffic. I am ordering you to leave the sidewalk. If you do so
voluntarily no charges will be filed against you. If you refuse to leave you will be
placed under arrest and charged with disorderly conduct." Exh. U-1, 6:36-7:04.

**The Arrest of "DF"**

74.   Approximately twenty seconds after Defendant Zielinski finished issuing that order,
video shows NYPD Officer John McNamara and other NYPD officers suddenly
and without warning pull a young woman – referred to herein as "DF" - from under
the mesh netting line at the base of the steps of 60 Centre Street. Exh. U-1, 6:54-
7:30.

75.   Immediately prior to DF's arrest, video shows an NYPD officer in a blue cap leaning
over to Officer McNamara and apparently whispering something in his ear. Exh. U-
1, 6:59 (3:05:22) – 7:04 (3:05:27) (Noting that that the Ex-U-1 TARU camera omits
the following 6 seconds of an arrest, from 7:04 (3:05:27) to 7:05 (3:05:32)).

76.   Video shows officers violently dragging DF up the stairs of 60 Centre Street. Exh.
U-1, 7:40 – 7:54 (3:06:19 - 3:06:06).

**Closure of the Sidewalk in Front of 60 Centre Street**

77.   After DF's arrest, Police officers, including Defendant Zielinski, gave additional
directions from the steps and the sidewalk in front of 60 Centre Street. Ex U1, 7:40-
14:30 (3:06:19 – 3:13:16); Ex T, 0:00-8:45; Ex V 3:26-6:00.

78.   Defendant Zielinski directed people on the sidewalk in front of the steps at 60

Centre Street to "move back," despite there being a street open to vehicular traffic

behind the people Defendant Zielinski was directing the order to. Ex U-1, 7:33-7:43.

79. Instructions from officers were frequently inaudible and/or unintelligible. Ex U-1,

7:42-7:46, 7:50-8:05 (Defendant Zielinski delivering inaudible instructions via

bullhorn), Ex U-1, 9:30-9:34, 9:38, 9:54 (Officer Cooke delivering unintelligible

orders via bullhorn); Ex T, 0:00-0:11 (Defendant Zielinski direction partly

intelligible), Ex T, 1:41 – 1:50, 1:47 (Officer direction partly unintelligible); Ex V,

4:07-420 (Defendant Zielinski direction partly intelligible).

80. The content of the instructions from the officers frequently contradicted what can

be observed in the video. Ex V, 03:26-03:46 (Defendant Zielinski stated "because

you're blocking the walkways, right now it's unsafe. You're blocking the walkway,

you need to move. Right now it's a danger, it's a hazard, you need to move" as

people moved on the sidewalk around him).

81. Defendant Zielinski admitted that there was no hazard at the scene as gave these

directions. Zielinski *Wiles* Dep. 184:4-10.

82. Defendant Anger testified that there were no safety concerns on at the location in

front of 60 Centre Street on November 5, 2011 that resulted in closing the sidewalk.

Anger *Wiles* Dep. 210:13-17.

83. Defendant Anger testified that the only "hazard" that might arise from the presence

of the protestors on the sidewalk was that – if a fire or medical emergency arose

(independently from and not caused by the protestors) the presence of the group on

the sidewalk might in some way interfere with a response. Anger *Wiles* Dep. 210:13-

211:19.

84. None of these orders directed people to go to Foley Square Park. Ex U1, 7:40-14:30

(3:06:19 – 3:13:16); Ex T, 0:00-8:45; Ex V 3:26-6:00.

85. None of these orders indicated where people could go to continue their protest activity. Ex U1, 7:40-14:30 (3:06:19 – 3:13:16); Ex T, 0:00-8:45; Ex V 3:26-6:00.

86. Defendant Anger directed officers to completely close and shut down the area of the sidewalk in front of 60 Centre Street to all people, except for officers. Anger Dep. 71:18-72:6.

87. Defendant Anger testified that the reason for closing entirely shutting down the sidewalk to non-police persons was so that officers could make arrests safely. Anger Dep. 72:8-21.

88. A supervisor, possibly Defendant Anger, ordered Defendant Zielinski to form a line and move people south. Zielinski Dep. 68:16-69:19.

89. Around 3:20 p.m., police completely blocked pedestrian traffic in front of 60 Centre Street by deploying mesh netting to close the sidewalk in front of 60 Centre Street. Exh. T, 7:23 – 7:43; Exh. U-14:33- 16:35.

90. Officers used mesh netting to direct those who had been in front of 60 Centre Street to move to the north and south on Centre Street, towards Worth Street in the north and Pearl Street in the south. Exh. T, 7:23 – 7:43; Exh. U-14:33- 16:35.

91. The sidewalk in front of 60 Centre Street was thus entirely closed to non-police persons. Anger Dep. 71:18-72:6; Zielinski *Wiles* Dep. 78:22-24.

92.  As police established the netting, Plaintiffs Asya Weisenhaus and Chloe Weisenhaus complied, and moved the south, to the area in front of the sally port in the intersection of Pearl Street and Center Street. Exh. T, 5:22 – 5:39 (C. Weisenhaus); Exh. U-1, 17:11 (3:24:15pm)-17:18 (3:24:36pm), 18:08 to 19:09. Exh. Y, 2:11- 3:05.

93. Video at this point shows A. Weisenhaus and C. Weisenhaus complying with directions to move south on Centre Street. Exh. W, 2:47-3:05.

## The Arrest of Jose Mediavilla

94. At around that time, Jose Mediavilla can be seen standing directly in front of a line of police officers holding mesh netting on the south end of the sidewalk at 60 Centre Street. Exh. T, 7:46-8:13.

95. As Defendant Zielinski stated through a bullhorn "Ladies and gentlemen, move back. Move back, sir. Move back. Move back. Let's go" and "this sidewalk is closed, you need to move" Mediavilla can be seen standing directly in front of Defendant Zielinski with his arms raised. Exh. T, 8:06 – 8:13.

96. As Defendant Zielinski pointed his bullhorn directly at Mediavilla and directed Mediavilla to move, Mediavilla stood close to Defendant Zielinski and repeatedly yelled "Treason!" Exh. T, 8:12 – 8:23.

97. After directing Mediavilla to move, Defendant Zielinski turned and walked a few steps away from Mediavilla. Exh. U-1 14:45-48.

98. Mediavilla pursued Defendant Zielinski, and took a step towards Zielinksi and shouted "Treason!" again. Exh. U-1 14:47-48.

99. Zielinski turned towards Mediavilla, who shouted "Treason!" two more times, while standing within a foot of Defendant Zielinski. Exh. U-1 14:46-47.

100. Mediavilla was then violently placed under arrest, continuing to scream "Treason!" as he was brought behind the police line. Exh. T, 8:23 – 8:45.

## Officers pushed south from the 60 Centre Street sidewalk

101. Defendant Zielinksi then ordered officers to move the northwest corner of the line of mesh netting south. Exh. U-1, 14:59 - 16:43.

102. Officers pushed that same orange mesh police line south, moving from (a) the south end of the sidewalk at 60 Centre Street ("Police Line Location A[4]") to (b) a new position extending from, at the western end, the southern corner of 60 Centre Street to, at the eastern end, to the middle of the Pearl Street Alley ("Police Line Location B1"). Exh. T, 8:34 – 9:02; Exh. U-1, 14:56 (3:19:34pm) – 15:54 (3:20:32pm).

103. Zielinski then stood at the southern corner of 60 Centre Street and ordered people to "move across the street." Exh. T, 9:26 – 9:48.

104. Video shows that ten seconds later, Defendant Zielinski announced via bullhorn: "Alright, let's move the line two feet forward, ladies and gentlemen, you need to move back okay? The sidewalk and the street is closed, the sidewalk and the street is closed temporarily, we're gonna open it up later. You need to move back." Exh. T, 9:59 – 10:14; Exh. Y, 1:45 – 2:04.

105. Defendant Zielinski then continued to order officers to push the orange mesh police line further, moving from (a) Police Line Location B1 to (b) a position from, at the western end, the police motor bikes lining Centre Street west of 60 Centre Street Block's southern corner and bike lane to, at the eastern end, the U.S. Marshall Service vehicle barricade in the Pearl Street Alley ("Police Line Location B2"). Exh. T, 10:17 – 11:02.

**The Weisenhaus sisters had vacated the 60 Centre Street sidewalk.**

106. At around that time, a number of Defendants, and other NYPD officers, remained in a police formation in and near the bike lane to the north of the Weisenhaus sisters, effectively blocking traffic in and around the bike lane. *See* Oliver Decl. Exh. 8.

---

[4]      "Police Location A" and other similar "Police Location" terms are defined and described in the Decker Decl.

107. C. Weisenhaus and A. Weisenhaus were confused because the officers' directions were unclear, inconsistent and had changed over time. For example, C. Weisenhaus heard a direction for people to get off the sidewalk and a direction to "move," without specifying where they should move to avoid arrest. C. Weisenhaus Dep. 22:6-11, 24:4-17, 26:13-23.

108. C. Weisenhaus asked officers to explain the directions they were giving but received no clarification. C. Weisenhaus Dep. 21:18-22:2, 29:7-13, 31:6-11.

109. A. Weisenhaus tried to talk to officers present because she was confused about the orders that were being given and wanted clarity so that she could comply. A. Weisenhaus Dep. 14:14-17; 17:6-16.

110. A. Weisenhaus "was confused as to what the police wanted and … was trying to make sure that [she] knew what their orders were but [it was] unclear because it seemed like they were wanting to push people towards the street but there wasn't really a place to go. There were cop motorcycles and a lot of people and some signs and it was difficult to move in the street and it didn't seem like that was necessary or what the police orders could have been asking so [she tried] to get more information and figure out what the police wanted". A. Weisenhaus Dep. 17:6-16.

111. Despite believing she was a pedestrian entitled to walk on the sidewalk, in response to hearing an officer direct people to get off the 60 Centre Street Block sidewalk, C. Weisenhaus complied with these orders and got off the sidewalk. C. Weisenhaus Dep. 22:20-23, 26:15-16; 27:22- 28:4, 28:3-7.

112. Video shows that during the push to Police Line Location B2, Chloe, Asya, and Maya Weisenhaus were all not on the 60 Centre Street Block sidewalk, but rather in the Pearl Street Alley. Exh. Y, 2:20 – 2:27.

113.  Video shows Chloe, Asya, and Maya to the south of the 60 Centre Street sidewalk near the Centre Street bike lane, talking to a uniformed officer. Exh. Y, 2:20 – 2:27.

114.  Video shows that immediately after Paragraph 113, Chloe and Asya Weisenhaus continued to walk south, and paused to listen at Police Line Location B2 when Defendant Zielinski began to use his bullhorn, standing near the southern corner of the 60 Centre Street Block's southern corner while facing demonstrators south of the line, and said, "Manhattan South Task Force, over here." Exh. T, 10:45 – 10:47; Exh. Y, 2:30 – 2:36.

**Vehicular and pedestrian traffic flowed in the vicinity of the Weisenhaus sisters.**

115.  Before the Weisenhaus arrests, photos and videos show police blocking traffic in and near the bike lane near 60 Centre Street. Oliver Decl. Exh. 8.

116.  Before the Weisenhaus arrest, video shows traffic flowing up Centre Street behind the Weisenhaus sisters. (Vans and a taxi at Exh. T, 11:17 – 11:22; three automobiles at Exh. U-1 17:23 (3:24:41pm) – 18:04 (3:25:21).

117.  In the minutes before the Weisenhaus arrest, video shows that the 60 Centre Street Block was emptied of all non-police personnel, approximately ten officers stood in the 60 Centre Street bike lane, Police Line Location B2 traversed the 60 Centre Street bike lane (Exh. T, 11:28 – 11:38, 12:04), and police motor bikes were parked along the Centre Street bike lane (Exh. U-1, 16:44 (3:22:49pm) – 16:46 (3:22:51pm)); Oliver Decl. Exh. 8.

**Police gave new directions in the new Alley location**

118.  Video shows shortly before the Weisenhaus sisters' arrests, a man in a beige leather jacket began to bark at officers to "Give us our prisoners back!" over and over near the police line for around two minutes straight. (Generally Exh. T, 10:55 – 12:31;

Exh. U-1, 16:19 (3:22:23pm) – 19:05 (3:27:43pm)).

119.    After the man had been bellowing "Give us our prisoners back!" at police along Police Line Location B for approximately two and a half minutes, video shows Defendant Zielinski announce to him via bullhorn, "Okay, good afternoon ladies and gentlemen. My name is Lt. Zielinski and I am with the Manhattan South Task Force. You are obstructing pedestrian traffic and vehicular traffic. I am ordering you to leave this location. If you do leave voluntarily no charges will be filed. If you do stay you will be charged with obstructing governmental administration and disorderly conduct." Exh. U-1, 17:23 (3:24:41pm) - 17:51 (3:25:08pm)

120.    Video shows that immediately after Zielinski's order described in Paragraph 119, the Weisenhaus sisters departed Police Line Location B2 by moving away around 5-10 feet away from Defendant Zielinski and the police line and toward Foley Square while traffic flowed up Centre Street behind them. Exh. U-1, 18:05 (3:26:44pm) (noting that Exh. U-1 omits the prior 23 seconds, from 18:04 (3:25:21) to 18:05 (2:26:44)).

121.    Video shows that approximately one minute after the announcement described in Paragraph 120, Defendant Zielinski stood in front of the man yelling "Give us our prisoners back!" and read aloud, via bullhorn pointed at the man: "Okay ladies and gentlemen, since you have refused to leave this roadway or sidewalk I am now ordering your arrest for the charge of disorderly conduct. If you interfere with an arrest and delay the opening of traffic or obstruct the roadway you will be charged with obstructing governmental administration. You will be fingerprinted and charged with the New York State Penal Law." Exh. U-1, 18:05 (3:26:44pm) - 18:32 (3:27:10pm); partially at Exh. W 0:00 – 0:19)

122.  Video shows that at the same time as the events described in Paragraph 121, the demonstrator continued to yell "Give us our prisoners back," the police line continued to block the Pearl Street crosswalk and Centre Street bike lane, and people in the vicinity walked unobstructed. Exh. U-1, 18:05 (3:26:44pm) - 18:32 (3:27:10pm).

123.  C. Weisenhaus did her best to comply with the orders she heard (C. Weisenhaus Dep. 2:27-5-7), and because they were confused by the officers' directions and it was not clear what to could do in order to comply with the directions, she briefly discussed how to comply with the orders with her two sisters. C. Weisenhaus Dep. 28:4-7; A. Weisenhaus Dep. 16:16-18, 26:11-13; see also video at Exh. U-1, 18:23 (3:27:01) – 18:40 (3:27:18) (as the officer gave the directions described in Paragraph 121, the three sisters can be seen talking with one another, looking at a car moving up Centre Street, and pointing at the steps of 60 Centre Street).

124.  Video shows that in the ten seconds following the events described in Paragraph 122, Defendant Zielinski crossed over to the demonstrators' side of Police Line Location B2 as three more cars flowed up Centre Street behind the Weisenhaus sisters. Exh. U-1, 18:33 (3:27:11pm) – 18:43 (3:27:21pm); Exh. W, 0:20 – 0:30.

125.  Video shows that during the five seconds immediately following the events described in Paragraph 124, Defendant Zielinski stopped next to the Weisenhaus sisters, who were approximately five to ten feet west of Police Line Location B2 and in the vicinity of the Centre Street bike lane where it crosses the Pearl Street Alley, and said, "Okay, you're going to have to leave or you're going to be arrested. Let's go, you have to leave," and then, without pause, grabbed Chloe Weisenhaus and continued, "Put your hands behind your back. Put your hands behind your back," arresting her

while a car drove up Centre Street behind her. Exh. U-1, 18:41 (3:27:19pm) - 18:47 (3:27:24pm); Exh. W, 0:28 – 0:33.

126. Video shows that during the ten seconds immediately following the events described in paragraph 125, Zielinski handed C. Weisenhaus over to another officer and then immediately walked further south, grabbing and arresting Asya Weisenhaus as well before handing her off to another officer. Exh. U-1, 18:47 (3:37:24) – 18:56 (3:27:34pm); Exh. W, 0:33 – 0:43; partial at Exh. Z, 3:34 – 3:36; C. Weisenhaus Dep. 32:7-8.

127. During the 36 seconds following the events described in paragraph 126, video shows that Defendant Zielinski then ordered officers gathered south of Police Line Location B2 "Okay let's go, flex him up," and joined several officers in arresting the demonstrator who had been yelling "Give us our prisoners back." Exh. U-1, 18:56 (3:27:34pm) – 19:32 (3:28:10pm); Exh. W 0:43 – 1:19; Exh. Z, 3:46 – 4:22.

128. A. Weisenhaus and C. Weisenhaus were arrested before they had time to figure out what they could do to comply with the officers' unclear directions. A. Weisenhaus Dep. 26:11-13.

129. Their sister took pictures of their arrests just after they occurred. Oliver Decl. Exh. 9.

130. Neither C. Weisenhaus nor A. Weisenhaus were on the sidewalk or street at the time of their arrests. C. Weisenhaus Dep. 23:24-25; 28:9-12; Exh. U-1, 18:41 (3:27:19pm) - 18:47 (3:27:24pm); Exh. W, 0:28 – 0:33; Exh. U-1, 18:47 (3:37:24) – 18:56 (3:27:34pm); Exh. W, 0:33 – 0:43; partial at Exh. Z, 3:34 – 3:36.

131. A. Weisenhaus's understanding of the reason for her arrest was "because I wasn't moving away in the correct way or to the correct place that they wanted me to or

with enough speed. I was confused about the orders and as a result lingered too long. There wasn't any time to ask the cops questions or clarify their orders so I figured that the arrest was a result of that bust still, as I said, I was confused about the orders so I don't know exactly what they wanted me to do that I did not do" A. Weisenhaus Dep. 21:2-10.

132. After her arrest, C. Weisenhaus told her arresting officer that she was confused about the orders that were being given. C. Weisenhaus Dep. 30:20-24.

133. In response, C. Weisenhaus' arresting officer stated something to the extent of "yeah, you probably shouldn't have been arrested" or "I don't really know why you were arrested." C. Weisenhaus Dep. 29:14-25.

134. C. Weisenhaus was placed in Flexi-Cuffs, which "were put on way too tight and [her] hands started to turn purple and were really hurting." C. Weisenhaus Dep. 10:10-11.

135. C. Weisenhaus cried and pleaded for her flexi-cuffs to be loosened or removed because they were too tight, in response to which an officer yelled at her and said "no I will tell you when they are too tight," and the officer did not remove or loosen the flexi-cuffs. C. Weisenhaus Dep. 10:11-16.

136. C. Weisenhaus was crying and pleading to whoever was around her to loosen or remove her flexi cuffs because they were causing her pain, including several police officers. C. Weisenhaus Dep. 12:3-7.

137. C. Weisenhaus became very scared when the officer yelled at her and refused to loosen her overly-tight fleix cuffs, "because then after that I was thinking, this is really scary. I am not sure if the custody I am in with the police is one of which I can trust to make sure that I am safe and not injured, because my cuffs continued to hurt me until eventually somebody, a different officer from the one that yelled at me

removed them and gave me another, looser FlexiCuffs." C. Weisenhaus Dep. 10:17-24.

138.  C. Weisenhaus's wrists were sore for over a day. C. Weisenhaus Dep. 35:16-17.

**Marilyn Collins and Elizabeth LaPenne were arrested while attempting to leave the area in the crosswalk in front of the Thurgood Marshall U.S. Courthouse.**

139.  Plaintiff Collins had left the 60 Centre Street sidewalk because she did not want to be arrested, and to comply with police directions to move of the 60 Centre Street sidewalk, Plaintiffs Collins moved to the Pearl Street Alley south of the 60 Centre Street block. Collins Dep. 25:21-24; 39:8-12.

140.  Plaintiff LaPenne had left the 60 Centre Street sidewalk because she did not want to be arrested, and to comply with police directions to move of the 60 Centre Street sidewalk, Plaintiffs Collins moved to the Pearl Street Alley south of the 60 Centre Street block. LaPenne Dep. 18:20-25, 19:4-6, 26:1-2.

141.  Just prior to her arrest, Plaintiff LaPenne attempted to cross Centre Street toward Foley Square and leave the area. LaPenne Dep. 21:6-9; 17-19.

142.  Immediately prior to her arrest, Plaintiff Collins was attempting to cross Centre Street toward Foley Square. Collins Dep. 26: 13-22; 40:4-21.

143.  During the events described in Paragraph 126, video briefly shows Plaintiffs Collins and LaPenne in the area of the Centre Street crosswalk at Pearl Street (approximately 37 feet south of the Weisenhaus arrest location). Exh. Y, 5:32 – 5:39.

144.  During the events described in Paragraph 143 and during the seconds after, video briefly shows the orange mesh netting remained in place at Police Line Location B2 (Exh. U-1, 19:32 (3:28:10pm), Exh. Z, 3:56 – 4:32), Zielinski gathered officers in the vicinity of the Weisenhaus arrests west of Police Line Location B2 (Exh. U-1, 19:40

(3:28:19pm), and two officers directed flowing motor vehicle traffic up Centre Street (Exh. U-1, 19:38 (3:28:16pm), 19:42 (3:28:20pm), (Exh. U-1, 19:47 (3:28:25pm)).

145. Video shows Defendant Zielinski walking south on Centre Street, in the bike lane, to the crosswalk at Centre and Pearl Streets, approximately 37 feet south of the Weisenhaus arrest location. Exh. U-1, 19:48 (3:28:26pm) - Exh. U-1, 19:55 (3:28:33pm) (note that the footage omits the next 20 seconds until the time stamp 3:28:52; Exh. W, 1:46 – 1:48).

146. During the events described in Paragraph 145, video shows Plaintiff Collins in the southern portion of the Centre St Crosswalk, attempting to walk toward Foley Square, as an officer directed motor vehicle traffic north on Centre Street in front of Plaintiff Collins, blocking her path. Exh. W, 1:45 – 1:46.

147. Immediately following the events described in Paragraph 145, video shows Defendant Zielinski grabbing and arresting LaPenne, who was still in the crosswalk, along with the officer in her vicinity continuing to direct motor vehicle traffic up Centre Street. Exh. U, 19:55 (3:28:33pm) (note that the footage omits the next 19 seconds until the time stamp 3:28:52; Exh. W, 1:46 – 1:48).

148. As she was attempting to walk away in the crosswalk, Plaintiff Collins turned around and paused when she saw her friend Plaintiff LaPenne being arrested. Collins Dep. 26:22-24; 40:20-24.

149. Immediately following the events described in Paragraph 147, as traffic continued to flow up Centre Street, Defendant Zielinski arrested Plaintiff Collins in the crosswalk at Centre Street and Pearl Street. Exh. W, 1:51; Oliver Decl. Exhs. 10-13.

150. Defendant Zielinski testified that he personally arrested Plaintiff Collins as she was trying to leave and crossing a street. Zielinski Dep. 17-20; Oliver Decl. Exhs. 10-13.

151. When Defendant Zielinski arrested Plaintiffs Collins and LaPenne, the light regulating pedestrian traffic in the crosswalk at Centre and Pearl Streets was white to indicate that pedestrians such as Plaintiffs could walk west toward Foley Square. Oliver Decl. Exhs. 10-13.

152. When she paused, Plaintiff Collins saw Defendant Zielinski point to her, and instruct Defendant Sharma to "arrest her". Collins Dep. 27:1-19, 28:9-18.

153. Video shows Defendant Zielinski gripped Plaintiff Collins by the wrist, and shoved her from behind into one of the officers processing LaPenne's arrest, while also hitting LaPenne in the back with his right elbow and forearm, knocking her several feet. Exh. W, 1:51 – 1:55. (Noting that that the Ex-U-1 TARU camera omits 19 seconds during this encounter, from 19:55 (3:28:33pm) to 19:56 (3:28:52pm)).

154. During and immediately after the moment described in Paragraph 153, video shows that Defendant Zielinski, while still gripping Plaintiff Collins by the wrist, then violently shoved Plaintiff Collins two times in the back with his bullhorn and body, knocking her off balance, and she was caught by [one of the uniformed officers]. Exh. W, 1:53 - 1:57. (Noting that that the Ex-U-1 TARU camera omits 19 seconds during this encounter, from 19:55 (3:28:33pm) to 19:56 (3:28:52pm)).

155. Immediately following the actions described in Paragraph 154, video shows that onlookers exclaimed "Whoa!" and "What the fuck is wrong with you? That's an old lady!" and "What is wrong with you?" and "What the fuck? What the fuck? You guys are fucked in the head." Exh. W, 1:53 – 1:58, 2:02 – 2:06, 2:10 – 2:16.

156. Plaintiff LaPenne expressed "complete shock" and "utter surprise at being arrested," because she was "56 years old and had no intention of being arrested," and asked her arresting officer why she was being arrested and to "please be gentle." LaPenne Dep.

16:15-18; 22:1-9.

157.   In response to asking him to her go, an officer told Plaintiff LaPenne, "I'm sorry, ma'am. I have to arrest you. My boss told us we have to arrest you. They are watching. I can't let you go." LaPenne Dep. 16:21-24.

158.   Plaintiff Collins did not understand why she was being arrested, and asked Defendant Sharma why she was being arrested. Collins Dep. 27:4-8.

159.   The DA Datasheet for Plaintiff Collins includes the alleged statement by Collins to Defendant Sharma that "I DID NOTHING WRONG. MY HUSBANDS A LAWYER." Collins DA Datasheet.

**Defendants then expanded the "frozen zone" beyond the 60 Centre Street block sidewalk and the Pearl Street Alley to a new, third location near the Thurgood Marshall U.S. Courthouse.**

160.   As the events described in Paragraphs 153 – 155 unfolded, video shows police pushed the orange mesh line from (1) Police Line Location B2 to (2) a new position on the Thurgood Marshall U.S. Courthouse block, stretching on the sidewalk from, at the eastern end, the U.S. Marshall Service booth to, at the western end, the Centre Street & Pearl Street corner ("Police Line Location C1"). Exh. U-1, 20:15 (3:29:11) – 20:49 (3:29:44pm); Exh. Z, 3:56 – 4:32, 4:48 – 4:58.

161.   While standing in the bike lane in front of the Thurgood Marshall U.S. courthouse (the "Thurgood Marshall Bike Lane Area") police then directed, pointed, and gestured at people in that vicinity to "Get back on the sidewalk. Let's go, get back here on the sidewalk. On the sidewalk, let's go! Let's go, all of you on the sidewalk, including press, let's go." Exh. U-1, 21:10 (3:30:07) – 21:25 (3:30:21).

162.   Video shows that the directions described in Paragraph 161 were given, people returned to the sidewalk and walked unobstructed to the north on the Thurgood

Marshall U.S. Courthouse block toward the corner of Centre Street & Pearl Street. Exh. U-1, 21:10 (3:30:07) – 21:37 (3:30:42) (noting that the Exh. U-1 TARU video omits 10 seconds between 21:37 (3:30:32) and 21:38 (3:30:42)). See also, Exh. X, 0:00 – 0:08, (person speaking to a uniformed officer on the sidewalk south of the Thurgood Marshall Bike Lane Area, saying "we didn't do anything wrong. We're walking on the sidewalk," to which the officer responded, "I told you to leave, I told you to leave," and a person responded, "You said get out of the street and on the sidewalk").

163.  Video shows that following the omitted footage described in Paragraph 162, Defendant Zielinski stood in the Thurgood Marshall Bike Lane Area and, while variously facing north and south, said via bullhorn "You need to move on. You need to move on or else you're gonna be arrested, alright. The sidewalk's closed." Exh. U-1, 21:39 (3:30:44) – 21:44 (3:30:48).

164.  Video shows that following the moments described in Paragraph 163, an officer beside Defendant Zielinski pointed toward the south, and Defendant Zielinski said "Let's go, you've gotta move on. You need to move on, let's go. Task Force, over to your left. Task Force, over here." Exh. U-1, 21:44 (3:30:48) - 22:02 (3:31:06) .

165.  Video shows that seconds after the directions described in Paragraph 164, Defendant Zielinski arrested a man wearing a green hat and jacket and standing on the northern portion of the Thurgood Marshall U.S. Courthouse block sidewalk. Exh. U-1, 22:07 (3:31:11) – 22:12 (3:31:16) (noting that Exh. U-1 video cuts out at this point and shifts to Exh. U-2).

**Plaintiff Shirazi was arrested without notice and as she was attempting to depart south.**

166.  Plaintiff Shirazi paused when she suddenly saw someone arrested in front of her.

Shirazi Dep. 77:8-22.

167.   In the moment immediately following Paragraph 165, video briefly shows Plaintiff
       Shirazi standing south of Defendant Zielinski on the sidewalk in front of the
       Thurgood Marshall U.S. Courthouse before backing away to depart toward the
       south. Exh. U-2, 0:00 (3:31:17) – 0:01 (3:31:20).

168.   After she paused and then departed as described in Paragraph 167, Plaintiff Shirazi
       was grabbed from behind by a "very tall man". Shirazi Dep. 77:8-9. Exh. U-2, 0:01
       (3:31:20) – 0:05 (3:31:25); Exh. X 0:08 – 0:10.

169.   During the arrest described in Paragraph 168, video shows officers extended the
       orange mesh netting of Police Line Location C1 south along the Centre Street
       sidewalk's curb to a point near the Thurgood Marshall Bike Lane Area (such position
       approximately 40 feet south of the Alley, "Police Line Location C2").

170.   Video shows Plaintiff Shirazi was arrested at the southern edge of Police Line
       Location C2 as it was being established (Exh. U-2, 0:00 (3:31:17) – 0:01 (3:31:20)),
       and her arrest continued while the line was extended to the Thurgood Marshall U.S.
       Courthouse. Exh. U-2, 0:13 (3:31:37) – 0:24 (3:31:55)

171.   As Police Line Location C2 was being extended to the Thurgood Marshall U.S.
       Courthouse (Exh. U-2, 0:13 (3:31:37) – 0:24 (3:31:55)), as described in Paragraph
       170, video shows Defendant Zielinski stood at the line facing south and said via
       bullhorn, "Ladies and gentlemen, you need to move on." Exh. U-2, 0:19 (3:31:48) –
       0:21 (3:31:50).

172.   Plaintiff Shirazi was shocked and panicked when she was suddenly grabbed from
       behind, and she yelled "Help!". Shirazi Dep. 38:7-13; Exh. U-2, 0:05 (3:31:25) – 0:10
       (3:31:32); Exh. X 0:08 – 0:10, Exh. Y 8:43 – 8:49; Oliver Decl. Exh. 15.

173.   In the following seconds, because of her shock and panic at being unexpectedly
       grabbed from behind, Plaintiff Shirazi initially screamed and "moved back and forth"
       to attempt to protect herself from "this huge thing [that] came from behind," in
       what she describes as being like a "fight or flight response." Shirazi Dep. 37:18-
       38:15, 40:13-15; Exh. U-2, 0:04 (3:31:19); Exh. X, 0:08 – 0:14.; Exh. Y 8:43 – 8:49.

174.   In the following seconds, an officer pushed Plaintiff Shirazi to the ground, orange
       netting was wrapped around her, and her arms and wrists were twisted behind her
       body. Shirazi Dep. 39:16-18; Exh. X, 0:12 – 0:14; Exh. Y 8:43 – 10:10.

175.   Around five police officers surrounded Plaintiff Shirazi as she was on the ground.
       Shirazi Dep. 39:24-25; Exh. X, 0:12 – 0:14; Exh. Y 8:43 – 10:10.

176.   During the course of her arrest, Plaintiff Shirazi did not try to get away from the
       officers. Shirazi Dep. 39:24-25; Exh. X, 0:12 – 0:14; Exh. Y 8:43 – 10:10.

177.   During the course of her arrest, as she was on the ground, Plaintiff Shirazi asked
       officers "What have I done? What did I do?," and a bystander asked "What did she
       do?" Exh. X, 0:29 – 0:41.

178.   During the course of her arrest, Defendant Louie, one of the officers on top of
       Plaintiff Shirazi, continuously twisted Plaintiff Shirazi's arm and wrist. Shirazi Dep.
       45:16-22; 46:19-22; 39:19-23.

179.   While she was being arrested on the sidewalk, Plaintiff Shirazi complained as
       Defendant Louie was twisting her arm and wrist that his actions were hurting her,
       and Plaintiff Shirazi began to cry from the pain. Shirazi Dep. 45:16-22; 46:19-22;
       39:19-23.

180.   Defendant Louie placed Plaintiff Shirazi was placed in plastic flexi-cuffs. Shirazi
       Dep. 36:25-37:4. Exh. Y, 9:18 – 9:22, 9:39 – 9:50.

181. Plaintiff Shirazi complained that the handcuffs were too tight and were hurting her. Shirazi Dep. 44:11-20.

**Plaintiff Heinz was arrested without notice and while talking to another officer.**

182. At the same time as the arrest described in Paragraph 165, video shows Plaintiff Heinz in conversation with an NYPD officer south of Police Line Location C1. Exh. Y, 8:36 – 8:43.

183. Plaintiff Heinz was then arrested as she was on the sidewalk. Heinz Dep. 44:8-10.

184. Plaintiff Heinz was shocked that she was arrested. Heinz Dep. 38: 23-25, 40:18-20.

185. Plaintiff Heinz saw her friend, Plaintiff Shirazi, yelling on the ground, "surrounded by big policemen." Heinz Dep. 32:4-6.

186. Plaintiff Heinz told her arresting officer that "I need to go over and see my friend, she's screaming for help". Heinz Dep. 32:21-22; Exh. U-2, 0:17 (3:31:44); Exh. X 0:19 – 0:21; Exh. Y, 8:52 - 8:58.

187. Video shows Plaintiff Heinz arrested within a police line approaching Plaintiff Shirazi as they are both in police custody for a matter of seconds, without actually touching Plaintiff Shirazi, Defendant Louie, or any other police officer. Exh. U-2, 0:00 – 0:17, Exh. X 0:19 – 0:25; Exh. Y, 8:32 - 8:53.

**Plaintiff MacLean was acting as a Legal Observer to the south of Plaintiffs Shirazi's and Heinz's arrests immediately prior to her arrest.**

188. Plaintiff MacLean arrived in Foley Square well after police had begun making arrests, and was in the area very briefly before her arrest. MacLean Dep. 73:4-5, 95:22-23.

189. Plaintiff MacLean did not hear any orders from the police after she arrived in the Foley Square area.  MacLean Dep. 73:23-24; 112:24- 113:3.

190. Before her arrest, Plaintiff MacLean was near the U.S. Marshals booth asking

arrestees on the other side for their names, in performing her role as a Legal Observer. MacLean Dep. 75:2-6; 76:23-24.

191. Plaintiff MacLean then saw that police were stretching netting in front of the Thurgood Marshall U.S. Courthouse, and she attempted to leave by moving south and crossing to the other side of the area in which the netting was being established. Plaintiff MacLean Dep. 82:24- 83:1; 84:25-85:2; 85:8-25; 91:22- 92:2; Exh. U-2, 0:18 (3:31:46) – 0:25 (3:31:57).

192. Plaintiff MacLean was dispersing to the south when Defendant Zielinski suddenly grabbed her from behind and placed her under arrest. MacLean Dep. 85:2-3; Exh. U-2, 0:25 (3:31:57) – 0:26 (3:31:59); Oliver Decl. Exh. 14.

193. After Plaintiff MacLean was placed under arrest by Defendant Zielinski, she was passed off to Defendant Delgado, who brought her to a police van. MacLean Dep. 86:4-13.

194. Plaintiff MacLean was arrested without notice, without an opportunity to remove herself from a situation where police were establishing a temporary barricade, without sufficient communication. MacLean Dep. 86:23- 87:1.

195. When Plaintiff MacLean was arrested, she was wearing her fluorescent green Legal Observer hat and badge, and it was visible that she was a Legal Observer. MacLean Dep. 89:3-7.

196. After her arrest, Plaintiff MacLean told Defendant Delgado and other officers that she was Legal Observer, multiple times. MacLean Dep. 88:19-22; 93:1-4.

197. Plaintiff MacLean told the Defendant Delgado that her arrest was improper. Maclean Dep. 93:4-5, 18-19, 24-25.

198. Plaintiff MacLean believes that her arrest was unconstitutional and illegal. Maclean

Dep. 103:3-11.

199.  Defendant Delgado did not pay respond to Plaintiff MacLean's complaints that her
      arrest was improper in general and because she had been present as a Legal
      Observer. Maclean Dep. 93:11-13.

**Events after Plaintiffs' arrests.**

200.  Video shows that Defendant Zielinski and other officers continued to push
      perceived protesters south on Centre Street after Plaintiffs' arrests. Exh. X, 1:39 –
      7:04.

201.  The sidewalk remained completely closed until approximately fifteen to twenty
      minutes after the demonstration ended. Zielinski *Wiles* Dep. 79:3-12.

**Plaintiff Shirazi**

202.  Defendant Zielinksi ordered Defendant Louie to arrest Plaintiff Shirazi. Louie Dep.
      66:11-15.

203.  Defendant Louie testified that it was only five seconds between when Defendant
      Zielinski gave a direction over the bullhorn and when Defendant Zielinski told
      Defendant Louie to arrest Plaintiff Shirazi for allegedly refusing to comply with it.
      Louie Dep. 72:16-22.

204.  Defendant Louie did not see any police officers ask Plaintiff Shirazi to move or give
      her any orders. Louie Dep. 69:24- 70:9, 71:22- 72:5, 72:23- 73:6.

205.  It was only a few seconds from the time Defendant Louie first saw Plaintiff Shirazi,
      to when he first touched her to arrest her. Louie Dep. 80:7-11.

206.  When Defendant Louie first saw Plaintiff Shirazi, police has already established a
      frozen zone on the sidewalk in front of 60 Centre Street. Louie Dep. 113:13-16.

207.  Defendant Louie could not recall whether Plaintiff Shirazi was standing or on the

ground when he first saw her. Louie Dep. 82:17-83:22.

208.   Defendant Louie testified that he did not know why she was on the ground. Louie
       Dep. 81:17-19.

209.   Defendant Louie testified that Plaintiff Shirazi did not resist arrest. Louie Dep. 89:6-
       8.

210.   Defendant Louie recalled Plaintiff Shirazi screaming on the ground as he placed flexi
       cuffs on her. Louie Dep. 88:2-14.

211.   Defendant Louie created an OLBS Report for Plaintiff Shirazi. Shirazi OLBS
       Report.

212.   THE OLBS Report states that Defendant Louie "OBSERVED DEFENDANT
       WITH APPROXIMATELY TWO OTHERS GIVEN ORDERS TO DISPERSE
       BY LT. ZIELINSKI MSTF. DEFT REFUSED TO DISPERSE CAUSING
       PUBLIC INCONVENIENCE ANNOYANCE AND PUBLIUC [SIC] ALARM."
       Shirazi OLBS Report.

213.   Defendant Louie testified that the extent of "public inconvenience" he observed was
       that Plaintiff Shirazi was "at the location when she was told to disperse" and she
       "refused to do so". Louie Dep. 109:24-110:5.

214.   Defendant Louie testified that the only "public annoyance" he observed was that
       Shirazi "was not listening to what she was asked to do." Louie Dep. 110:6-10.

215.   Defendant Louie did not remember if he saw any members of the public annoyed at
       Plaintiff Shirazi before he arrested her.  Louie Dep. 110:18-21.

216.   Defendant Louie testified that the public was inconvenienced because they had to
       walk around the sidewalk that police had closed. Louie Dep. 112:2-5.

217.   Defendant Louie informed prosecutors that Shirazi was "in a group of at least 25

people ifo of [sic] 60 Centre St.. (by Pearl & Centre), "Lt. Zeilinski ordered

Protesters to disperse from the sidewalk numerous times via blowhorn," and

"Approx 25 people were told numerous times to disperse, blocking sidewalk, unsafe,

blocking pedestrians from walking." Shirazi DA Datasheet.

218.  Plaintiff Shirazi was released with a DAT at around 6:22pm. Shirazi DAT.

219.  Defendant Louie swore out a criminal court accusatory instrument alleging that he

observed Plaintiff  Shirazi

> . . . standing with a group of  at least twenty-five individuals in front
> of  the  above location. Deponent further states that due to the
> presence of said group, the sidewalk was blocked, pedestrians could
> not walk on said sidewalk, and pedestrians were forced to walk into
> the  street to get around said group.
>
> Deponent further observed Lieutenant Michael Zielinski of the
> Patrol Boro Manhattan South Task Force repeatedly, via bullhorn,
> instruct said group of individuals in substance to disperse and leave
> the area.
>
> Deponent further states that defendant did not leave the area.

Shirazi AI.

220.  Based on that accusatory instrument, on or about January 10, 2012, Ms. Shirazi was

charged with violating PL §§ 240.2(5) and 240.20(6) (Disorderly Conduct). Shirazi

Court Action Sheet.

221.  At her arraignment, Shirazi was released on her own recognizance (or "ROR'd").

Shirazi Court Action Sheet.

222.  In an Amended Decision and Order dated May 22, 2012, following motion practice,

the New York City Criminal Court dismissed the PL § 240.2(5) charge as facially

insufficient. Shirazi Decision and Order.

223.   Plaintiff Shirazi appeared on January 10, 2012; March 5, 2012; May 21, 2012; November 14, 2012; November 20, 2012; November 27, 2012; November 30, 2012; December 7, 2012; and February 1, 2013. Shirazi Court Action Sheet.

224.   On February 1, 2013, the case against her was dismissed on speedy trial grounds. Shirazi Court Action Sheet.

**Plaintiff Collins**

225.   Defendant Sharma did not see Defendant Zielinski or NYPD Lt. Cooke give Plaintiff Collins specifically any order. Sharma Dep. 71:6-23; 75:13-14.

226.   Defendant Sharma observed Plaintiff Collins moving when he saw her prior to arrest. Sharma Dep. 69:3-7-.5

227.   The "very next thing" after Defendant Sharma first saw Plaintiff Collins was that "she didn't move. She was placed under arrest." Sharma Dep. 73:10-18.

228.   Defendant Sharma did not recall any pedestrians or vehicles blocked by Plaintiff Collins.  Sharma Dep. 83:25- 84:11

229.   Defendant Sharma believes that to arrest for disorderly conduct for blocking pedestrian traffic, there do not have to be any pedestrians actually blocked. Sharma Dep. 83:11-22.

230.   Defendant Sharma did not see anyone try to, or blocked from, getting into the courthouse. Sharma Dep. 88:5-89:4

231.   NYPD Officer Ciaramitaro completed an OLBS Report Plaintiff Collins.  Collins OLBS Report.

232.   The OLBS Report states that Collins was arrested at the northeast corner of Foley Square and Centre Street. Collins OLBS Report.

233. The Collins OLBS Report states that Officer Ciaramitaro observed Plaintiff Collins

"WITH APPROX. 25 OTHERS BLOCKING M/V TRAFFIC. DEFT. WAS

GIVEN ORDERS NUMEROUS TIMES BY LT. ZIELINSKI TO DESPENSE

[SIC]. DEFT. REFUSED CAUSING PUBLIC ALARM AND DID [SIC]

FOLLOW ORDERS." Collins OLBS Report.

234. Plaintiff Collins was released with a DAT at around 7:24pm. Collins DAT.

235. According to the DA Datasheet, Defendant Sharma informed prosecutors that

Plaintiff Collins "was in a group of approx 50 individuals blocking the sidewalk,"

"Lt. Cooke gave orders to move via a mega phone [Collins] refused disperse & kept

returning to the same spot" and the "group caused pedestrians to have to go around

the group of individuals." Collins DA Datasheet.

236. On December 20, 2011, Defendant Sharma swore out a criminal court accusatory

instrument alleging that on November 5, 2011 at about 15:20 hours in front of 60

Centre Street he observed Ms. Collins

> ... standing with a group of at least fifty individuals in front of the
> above location. Deponent further states that due to the presence of
> said group, the sidewalk was blocked, pedestrians could not walk on
> said sidewalk, and pedestrians were forced to walk around said group.
>
> Deponent further observed Lieutenant William Cooke, of the
> Disorder Control Unit that repeatedly, via bullhorn, instruct said
> group of individuals in substance to disperse and leave the area.
> Deponent further states that defendant did not leave the area.

Collins AI.

237. Based on that accusatory instrument, on or about January 10, 2012, Plaintiff Collins

was charged with violating PL §§ 240.2(5) and 240.20(6) (Disorderly Conduct).

Collins Court Action Sheet.

238. Plaintiff Collins was released on her own recognizance. DA Datasheet; Collins Court

Action Sheet.

239.  In a Decision and Order dated April 18, 2012, following motion practice, the New
York City Criminal Court dismissed the PL § 240.2(5) charge as facially insufficient.
Collins Decision.

240.  Ms. Collins appeared on or about January 10, 2012; March 5, 2012; May 21, 2012;
November 14, 2012; November 27, 2012; November 30, 2012; December 7, 2012;
and February 1, 2013. Collins Court Action Sheet.

241.   On February 1, 2013 the case against her was dismissed on speedy trial grounds.
Collins Court Action Sheet.

**Plaintiff Heinz**

242.  Defendant Zielinksi ordered Defendant Delgado to arrest Plaintiff Heinz, and so
Defendant Delgado arrested her. Delgado Dep. 39:3-40:5.

243.  Defendant Delgado testified that all he remembered about Plaintiff Heinz's arrest is
that "I just remember her in the crowd." Delgado Dep. 66:8-11.

244.  Defendant Delgado "was not sure" how many pedestrians he saw Plaintiff Heinz
block, or who had to go around her. Delgado Dep. 49:22-50:7.

245.  Defendant Delgado was not sure what pedestrians he saw Plaintiff Heinz block, but
testified that he "must have seen some" and mentioned only a "hotdog guy" whom
he said police had been asking to move "for a long time." Delgado Dep. 53:12-25;
54:14-18.

246.  Defendant Delgado testified, with regards to Plaintiff Heinz: "I don't remember her
blocking pedestrians." Delgado Dep. 55:8-9.

247.  Defendant Delgado testified that Plaintiff Heinz did not block any vehicles. Delgado
Dep. 50:21-23

37

248. Plaintiff Heinz was released at around 7:30pm with a DAT. Heinz DAT.

249. Defendant Delgado created an On-Line Booking Sheet for Plaintiff Heinz.  Delgado Dep. 75:8-12; Heinz OLBS Report.

250. The OLBS Report states that Plaintiff Heinz was arrested at the North East corner of Centre Street and Pearl Street. Heinz OLBS Report.

251. The OLBS Report states that Plaintiff Heinz "W/ABOUT 30 OTHERS WERE GIVEN AN ORDER TO DISPERSE. ABOVE DEF REFUSED SAID ORDER TO DISPERSE AND HER ARREST WAS ORDERED BY SUPERVISOR WHO GAVE WARNING." Heinz OLBS Report.

252. According to the DAT Datasheet, Defendant Delgado told prosecutors that Plaintiff Heinz "was in a group of at least 25 people ifo 60 Centre St. (by Pearl & Centre)," "Lt. Zeilinski ordered Protesters to disperse from the sidewalk numerous times via blowhorn," and "Approx 25 people were told numerous times to disperse, blocking sidewalk, unsafe, blocking pedestrians from walking." Heinz DA Datasheet.

253. On January 9, 2012, at around 11:03 AM, Defendant Delgado swore out a criminal court accusatory instrument alleging that, on November 5, 2011, at about 15:30 hours on the corner of Centre Street and Pearl Street, in the County and State of New York, he observed Ms. Heinz

> . . . standing with  a group of  at least twenty-five individuals in front of the above location. Deponent further states that due to the presence of said group, the sidewalk was blocked, pedestrians could not walk on said sidewalk, and pedestrians were forced to walk into the street to get around said group.

> Deponent further observed Lieutenant Michael Zielinski of the Patrol Boro Manhattan South Task Force repeatedly, via bullhorn, instruct said group of individuals in substance to disperse and leave the area.

> Deponent further states that defendant did not leave the area.

Heinz AI.

254. Based on that accusatory instrument, on or about January 10, 2012, Ms. Heinz was charged with violating PL §§ 240.20(5) and 240.20(6) (Disorderly Conduct). Heinz Court Action Sheet.

255. Plaintiff Heinz was released on her own recognizance. Heinz Court Action Sheet.

256. In a Decision and Order dated April 18, 2012, following motion practice, the New York City Criminal Court dismissed the PL § 240.20(5) charge as facially insufficient. Heinz Decision and Order.

257. Ms. Heinz appeared on or about January 10, 2012; March 5, 2012; May 21, 2012; November 14, 2012; November 27, 2012; November 30, 2012; December 7, 2012; and February 1, 2013. Heinz Court Action Sheet.

258. On February 1, 2013 the case against her was dismissed on speedy trial grounds. Heinz Court Action Sheet.

**Plaintiff LaPenne**

259. Officer Ciaramitaro, Plaintiff LaPenne' arresting officer, testified that he did not recall any fellow officer telling him what Plaintiff LaPenne had done prior to her arrest, what she had done that constituted disorderly conduct, or anything else about her arrest. Ciaramitaro Dep. 47:19-49:11.

260. Ciaramitaro did not observe Plaintiff LaPenne before arresting her, even though he swore a complaint that he had. Ciaramitaro Dep. 52:13-15, 55:3-8.

261. Ciaramitaro did not see Plaintiff LaPenne refuse to comply with any orders before arresting her. Ciaramitaro Dep. 54:8-11, 55:13-16.

262. Ciaramitaro did not see Plaintiff LaPenne block any vehicular traffic before she was arrested. Ciaramitaro Dep. 55: 17-20.

263. Ciaramitaro did not recall whether any other officer or supervisor had told him that Plaintiff LaPenne was blocking traffic. Ciaramitaro Dep. 55:2—56:12.

264. Plaintiff LaPenne was released after more than four hours with a DAT. Complaint ¶ 57; LaPenne Dep. 24:2-4.

265. Ciarmitaro created an On-Line Booking Sheet for Plaintiff LaPenne. LaPenne OLBS Report.

266. The OLBS Report states that LaPenne was arrested at the northeast corner of Foley Square and Centre Street. LaPenne OLBS Report.

267. The OLBS Report states that Officer Ciarmitaro observed LaPenne  "WITH APPROX. 25 OTHERS & WAS GIVEN ORDERS TO DISPENSE [SIC] BY LT. ZIELINSKI. DEFT. REFUSED CAUSING PUBLIC INCONVENIENCE AND BLOCKING M/V TRAFFIC." LaPenne OLBS Report.

268. On January 10, 2012, Plaintiff LaPenne appeared at 100 Centre  Street pursuant to the DAT  and learned that the Office of the District Attorney of New York County had declined to prosecute her. LaPenne DP Letter.

**Plaintiff MacLean**

269. Defendant Delgado noticed Plaintiff MacLean's neon green hat prior to her arrest. Delgado Dep. 41:2-11.

270. After her arrest, Defendant Delgado recognized that Plaintiff MacLean's hat was a Legal Observer hat. Delgado Dep. 42:3-6.

271. Defendant Delgado understands the role of Legal Observers to "just observe what is going on, the crowd, to make sure everything is going accordingly and police are acting within the scope of their employment." Delgado 42:16-19.

272. In his experience with the task force, Defendant Delgado has seen Legal Observers

at other protests, and he has seen Legal Observers try to get the names of arrestees. Delgado Dep. 42:20-43:4.

273. Defendant Delgado is not sure how long he observed Plaintiff MacLean before arresting her. Delgado Dep. 40:23-25.

274. Defendant Delgado does not know if he arrested Plaintiff Heinz or Plaintiff MacLean first, or how much time elapsed before their arrests. Delgado Dep. 43:21-44:2.

275. Defendant Delgado is not sure if he saw Plaintiff MacLean block any pedestrians. Delgado Dep. 49:16-18; 54:19-55:4.

276. Defendant Delgado did not see Plaintiff MacLean block any vehicular traffic. Delgado Dep. 50:12-14.

277. Defendant Delgado's reason for believing that Plaintiff MacLean had not obeyed a police order was that "[s]he was right up against the orange mesh. I think everybody in that crowd had ample time to turn around, cross the street, join the other protesters." Delgado Dep. 63:17-21.

278. Plaintiff MacLean was released after approximately four hours with a DAT. MacLean Dep. 97:21-24; MacLean DAT (7:30pm).

279. Defendant Delgado created an On-Line Booking Sheet for Plaintiff MacLean. Delgado Dep. 75:8-12; MacLean OLBS Report.

280. The OLBS Report states that Plaintiff Maclean was arrested at the South East corner of Centre Street and Peal Street. MacLean OLBS Report.

281. The OLBS Report states that MacLean "W/ABOUT 30 OTHERS WERE GIVEN AN ORDER TO DISPERSE. ABOVE DEFT REFUSED SAID ORDER TO DISPERSE. HER ARREST WAS ORDERED BY THE SUPERVISOR WHO

GAVE THE WARNINGS- PEDESTRIAN TRAFFIC WAS OBSTRUCTED."

MacLean OLBS Report.

282. Defendant Delgado completed a DAT investigation form for Plaintiff MacLean.

Delgado Dep. 74:9-14; MacLean DA Datasheet.

283. Defendant Delgado informed prosecutors that Plaintiff MacLean was "in a group of

at least 25 people ifo of [sic] 60 Centre St.. (by Pearl & Centre), "Lt. Zeilinski

ordered Protesters to disperse from the sidewalk numerous times via blowhorn," and

"Approx 25 people were told numerous times to disperse, blocking sidewalk, unsafe,

blocking pedestrians from walking." MacLean DA Datasheet.

284. The DA Datasheet for Plaintiff MacLean includes the alleged statement by her to

Defendant Delgado that "I'M A LEGAL OBSERVER. I CAN'T WAIT TO SEE

YOU IN COURT AND DEFEND THIS ARREST." MacLean DA Datasheet.

285. On January 9, 2012, at around 11:20 AM, Defendant Delgado swore out a criminal

court accusatory instrument alleging that, on November 5,2011, at about 15:30 hours

on the corner of Centre Street and Pearl Street, in the County  and State of New

York,  he observed Ms. MacLean

> . . . standing with  a group of  at least twenty-five individuals in front of the
> above location. Deponent further states that due to the presence of said
> group, the sidewalk was blocked, pedestrians could not walk on said
> sidewalk,  and pedestrians were forced to walk into the  street to get around
> said group.
>
> Deponent further observed Lieutenant Michael Zielinski of the Patrol Boro
> Manhattan South Task Force repeatedly, via bullhorn, instruct said group of
> individuals in substance to disperse and leave the area.
>
> Deponent further states that defendant did not leave the area.

MacLean AI.

286. Based on that accusatory instrument, on or about January 10, 2012, Maclean was

charged with violating PL §§ 240.20(5) and 240.20(6) (Disorderly Conduct). MacLean Court Action Sheet.

287.   Maclean was released on her own recognizance.  Maclean Court Action Sheet.

288.   Maclean appeared in criminal court on March 5, 2012 and November 14, 2012. MacLean Court Action Sheet.

289.   The case against Plaintiff MacLean was ultimately dismissed on November 14, 2012 on the motion of the prosecutor on the grounds that the prosecution could not prove the case beyond a reasonable doubt. MacLean Court Action Sheet; MacLean Dep. 104:16-18; Oliver Decl. ¶ 4.

**Plaintiff A. Weisenhaus**

290.   Plaintiff A. Weisenhaus was arrested by Defendant Li. Li Dep. 24:19-25.

291.   Defendant Li testified that he arrested one person on November 5, 2011. Li Dep. 20:19-20.

292.   Defendant Li remembers "very little, maybe nothing" about November 5, 2011. Li Dep. 20:8-9, 24:19-25.

293.   Defendant Li could not remember or guess as to how many police or protesters he saw when he arrived in Foley Square on November 5, 2011. Li Dep. 29:10-31:2.

294.   Defendant Li could not recall what direction he approached Foley Square from, how long he was in Foley Square before he saw A. Weisenhaus, how long he observed A. Weisenhaus before he arrested her, or how long he was out the scene before placing anyone under arrest.  Li Dep. 35:17-36:5, 36:20-24.

295.   Defendant Li could not recall where he was standing when warnings were given, where A. Weisenhaus was standing, where Defendant Zielinski was standing, where

traffic was blocked, or whether A. Weisenhaus blocked pedestrian traffic. Li Dep. 37:20- 38:18.

296. Defendant Li testified that "I only remember my Lieutenant give out warning. I arrest her." Li Dep. 36:4-5.

297. Defendant Li did not remember whether there was any active traffic going east to west on Pearl Street on November 5, 2011 (Li Dep. 43:23-44:3) or whether that part of Pearl Street is normally open to traffic (Li Dep. 44:4-9).

298. Defendant Li has "no idea" whether Pearl Street was totally closed to vehicular traffic on November 5, 2011.

299. Defendant Li could not remember anything else about A. Weisenhaus's arrest. Li Dep. 43:6-19.

300. Despite testifying that he remembered little-to-nothing about the date of the incident, and could not recall the location of anyone or whether the road was even open to traffic, Defendant Li testified that he observed A. Weisenhaus obstructing traffic, by standing at an intersection.  Li Dep. 21:12-16.

301. When asked repeatedly for any details of A. Weisenhaus's actions that lead to her arrest, Defendant Li testified that he did not remember or remembered "not too much" about A. Weisenhaus blocking vehicular traffic. Li Dep. 45:9- 50:6.

302. Defendant Li testified that he observed cars, which had to go around A. Weisenhaus, because she was in an intersection. Li Dep. 23:6-18.

303. Defendant Li could not estimate how many cars he saw A. Weisenhaus block. Li Dep. 51:14-16.

304.  After testifying repeatedly that he could not remember anything, Defendant Li
      testified that he could "only remember the other cars avoiding some area in the
      corner of protest," "because so many people are there." Li Dep. 52:25-53:7.

305.  Defendant Li then testified that he did not remember anything about cars avoiding
      the corner of the protest. Li Dep. 53:8-11.

306.  Defendant Li did not remember if he saw any cars at all on Centre Street, Duane
      Street, or Pearl Street (Li Dep. 60:5-14), may have seen cars on Worth or Lafayette
      street, or may have been confusing the two streets (Li Dep. 60:15- 61:13).

307.  Defendant Li does not remember anything about the pedestrian traffic in the area in
      the 10 minutes prior to his arresting A. Weisenhaus. Li Dep. 53:19-54:8.

308.  Defendant Li does not remember if officers were directing vehicular traffic or
      blocking pedestrian traffic when he arrested A. Weisenhaus. Li Dep. 55:12-22.

309.  Defendant Li created an On-Line Booking Sheet for A. Weisenhaus. Li Dep. 65:3-6;
      A. Weisenhaus OLBS.

310.  The On-Line Booking Sheet states that Plaintiff A. Weisenhaus was arrested at the
      North East Corner of Centre Street and Pearl Street. A. Weisenhaus OLBS.

311.  The Online booking sheet for Plaintiff A. Weisenhaus states that "AT TPO PO
      OBSERVED EDFT [SIC] REMAINING IN STREET OBSTRUCTING
      VEHICULAR TRAFFIC AFTER MSTF LT GAVE LAWFUL ORDER TO
      DISPERSE. DEFT REFUSED TO LEAVE AND STAYED IN LOCATION." A.
      Weisenhaus OLBS.

312.  Defendant Li does not remember if he chose the language in the detail section of the
      OLBS, whether anyone assisted him in filling out the arrest processing paperwork,
      whether he input the information into the Omniform system, whether he created a

scratch of the OLBS sheet, or if he created a DAT investigation form. Li Dep. 65:7-12, 67:11-14.

313. Defendant Li does not remember if A. Weisenhaus made any statements to him, does not remember if she said "What Am I getting arrested for, what is that charge, I was leaving," and does not remember if he told a prosecutor that she had made this statement. Li Dep. 70:15-25.

314. A. Weisenhaus was released after approximately five hours with a DAT. Complaint.

315. Defendant Li does not remember if he met with a prosecutor about this case on December 9, 2011, and he does not remember what, if anything, he told the prosecutor about this case. Li Dep. 72:10-73:2.

316. Defendant Li told prosecutors that "Lt. Zeilinski [sic] ordered Protesters to disperse from the sidewalk & Street numerous times via blowhorn" and "D told numerous times to disperse, blocking street, unsafe, blocking cars from driving and pedestrians from walking."). A. Weisenhaus DA Datasheet.

317. The DA Datasheet is confusing and contradictory, in that it alleges that A. Weisenhaus was somehow on both the street and the sidewalk, simultaneously blocking vehicular and pedestrian traffic A. Weisenhaus DA Datasheet.

318. The DA Datasheet states that A. Weisenhaus stated to Defendant Li: "WHAT AM I GETTING ARRESTED FOR. WHAT'S MY CHARGE. I WAS LEAVING."

319. On December 9, 2011, at around 12:50PM, Defendant Li swore out an accusatory instrument, alleging that, on November 5, 2011 at about 15:30 hours at Pearl Street and Centre Street opposite of Foley Square, in the County and State of New York, he observed A. Weisenhaus

> …standing with a group of approximately 100 individuals in
> front of the above location. Deponent further states that due

> to the presence of said group, the street was blocked, causing cars to have to go around the group of said individuals.
>
> Deponent further observed Lieutenant Michael Zielinski, of the Patrol Boro Manhattan South Task Force repeatedly, via bullhorn, instruct said group of individuals in substance to disperse and leave the area.
>
> Deponent further states that defendant did not leave the area.

A. Weisenhaus AI.

320. Based on that accusatory instrument, on or about January 10, 2012, A. Weisenhaus was charged with violating PL §§ 240.20(5) and 240.20(6) (Disorderly Conduct). A. Weisenhaus Court Action Sheet.

321. At A. Weisenhaus's arraignment on January 10, 2012, the prosecution gave notice that A. Weisenhaus had allegedly stated to Defendant Li words to the effect of, "What Am I getting arrested for, what is that charge, I was leaving."

322. A. Weisenhaus appeared on or about January 10, 2012; March 5, 2012; May 21, 2012; November 14, 2012; and November 20, 2012.

323. On November 20, 2012  A. Weisenhaus accepted an Adjournment in Contemplation of Dismissal ("ACD") to resolve the case. A. Weisenhaus Court Action Sheet; Oliver Decl. ¶ 3.

**Plaintiff C. Weisenhaus**

324. Officer Nikim Walker testified that he was involved in arresting C. Weisenhaus. Walker Dep. 22:4-6.

325. Walker cannot recall anything about C. Weisenhaus' conduct prior to her arrest. Walker Dep. 22:4-25.

326. The first thing Walker recalls about C. Weisenhaus is that Defendant Zielinski assigned him to arrest her.  Walker Dep. 29:3-9.

327. C. Weisenhaus was released at around 8:30pm with a DAT. C. Weisenhaus DAT.

328. On January 9, 2010, at around 11:40AM, Defendant Walker swore out an accusatory

   instrument, alleging that, on November 5, 2011 at about 15:30 hours at Pearl Street

   and Centre Street opposite of Foley Square, in the County and State of New York,

   he observed C. Weisenhaus

> …standing with a group of approximately 100 to 200 individuals in front of the above location. Deponent further states that due to the presence of said group, the sidewalk was blocked, pedestrians could not walk on said sidewalk, and pedestrians were forced to walk into the street to get around said group.

> Deponent further observed Lieutenant Michael Zielinski, of the Patrol Boro Manhattan South Task Force repeatedly, via bullhorn, instruct said group of individuals in substance to disperse and leave the area.

> Deponent further states that defendant did not leave the area.

   C. Weisenhaus AI.

329. Based on that accusatory instrument, on or about January 10, 2012, C.

   Weisenhaus was charged with violating PL §§ 240.20(5) and 240.20(6)

   (Disorderly Conduct).  C. Weisenhaus Court Action Sheet.

330. At C. Weisenhaus's arraignment on January 10, 2012, the prosecution gave

   notice that C. Weisenhaus had allegedly stated to Defendant Walker words to

   the effect of, "I didn't hear him tell the crowd to disperse."

331. C. Weisenhaus was released on her own recognizance.  C. Weisenhaus Court

   Action Sheet.

332. C. Weisenhaus appeared on or about January 10, 2012; March 5, 2012; May

   21, 2012; November 14, 2012; and November 20, 2012.

333.   On November 20, 2012 C. Weisenhaus accepted an ACD to resolve the case.

C. Weisenhaus Court Action Sheet; Oliver Decl. ¶ 3.

334.   C. Weisenhaus accepted an ACD because she went to court multiple times

over a long span of time, and officers did not show up, "so eventually in

order to just . . . not having to schedule our lives around these court dates,

we took the ACD." C. Weisenhaus Dep. 34:7-12.

### Injuries

**Plaintiff Shirazi**

335.   Plaintiff Shirazi did not know that she could request medical attention while in

custody. Shirazi Dep. 47:14-17.

336.   Plaintiff Shirazi called her doctor after she was released from custody on a Saturday

night, and her doctor told her to continue icing her hand and come in to see the

doctor on the following Tuesday.  Shirazi Dep. 48:8-15.

337.   Plaintiff Shirazi went to see her doctor on the Tuesday after her arrest, and after an

examination her doctor told her to continue icing her hand and to take painkillers,

which she did. . Shirazi Dep. 49:5-23; 50:6-8.

338.   Plaintiff Shirazi is traumatized from being attacked by the officers in this incident

and the brutality she experienced. Shirazi Dep. 62:20-23.

339.   Plaintiff Shirazi is fearful at protests because of this incident. Shirazi Dep. 62:23-

63:2.

340.   Plaintiff Shirazi is fearful and worried for her children and grandchildren because of

this incident, because she now feels that she cannot trust police officers to protect

them when they are out on the street. Shirazi Dep. 63:8-20.

341.   Because of Defendant Louie's twisting Plaintiff Shirazi's hand and wrist, Plaintiff

Shirazi's right hand was very swollen, discolored, and in enormous pain. Shirazi Dep. 46:19-22; 47:3-9 ("My hand was very, very swollen. At the time it was discolored. It was blue in places. It was red in places. It looked like a turtle's back. . . . It was my right hand, and I was in enormous pain."  Shirazi Dep. 47:3-9.); Oliver Decl. Exh. 16.

342.  Plaintiff Shirazi's swelling went away after around a week. Shirazi Dep. 50:13-14.

**Plaintiff Collins**

343.  Plaintiff Collins suffered emotional injuries in a variety of ways, including in needing to make arrangements at work for her court appearances, because it required Plaintiff to speak to her supervisor each of the many times she returned to court, to re-arrange things with co-workers, and rearrange her work schedule, which was difficult and humiliating. Collins Dep. 45:19-24; 47:9-16.

344.  With respect to emotional injuries, Plaintiff Collins was upset and angry that she was arrested, because she thought she "was an innocent person, . . . exercising my First Amendment rights to be at a protest, . . . I was not doing anything illegal. I had complied with police orders to get off the sidewalk, so I was very upset." Collins Dep. 43:7-13; 44: 7-10.

345.  Plaintiff Collins experienced embarrassment because of this arrest, because she "was paraded in front of a lot of people handcuffed" (Collins Dep. 43:16-17) and she "was being pushed along and a lot of people were looking" (Collins Dep. 43:23-24). *See also* Collins Dep. 47:9-16.

346.  Plaintiff Collins experienced "suffering" from being put in a jail cell after this arrest and not knowing when she would be released.  Collins Dep. 46:18-20.

347.  Plaintiff Collins experienced suffering as a mother, because her daughter was

expecting her, and she was not allowed to call her daughter to tell her where she was, while she was being held at the precinct. Collins Dep. 46:20-47:3.

348. Plaintiff Collins suffered emotional injuries from going to court appearances in this case, because "each time going to court was anxiety producing," because she "did not know what to expect" and was "nervous," there was a lot of anxiety in Plaintiff's expectations of what would happen, and "mental anguish" in "worrying what was going to happen each time we went to court" and whether she would be "further punished." Collins Dep. 45-46:18.

**Plaintiff Heinz**

349. After her arrest, there was a delay before Plaintiff Heinz was placed in a jail cell because a photograph of her had been taken prior to her placement in the transport van, and when she arrived at One Police Plaza there was no "evidence that she existed." Heinz Dep. 36: 5-7; 43:9-10; 43:24-44:7.

350. During this delay, Plaintiff Heinz was left standing handcuffed in a yard for at least an hour, without anyone explaining to her what was happening.  Heinz Dep. 43:9-44:7.

351. Plaintiff Heinz experienced emotional distress because of this experience. Heinz Dep: 38:12

352. Plaintiff Heinz's sole means of employment is a private psychotherapy practice. Heinz Dep 8:15-25.

353. As a result of this arrest, Plaintiff Heinz lost wages on four dates on which she was required to be away from her practice and in court. Heinz Dep. 9:10-10:3; Oliver Decl. Exh. 60 ($4,825 in lost wages).

**Plaintiff LaPenne**

354.  Plaintiff LaPenne asked to use a private toilet while in police custody because she has had issues, but she was not allowed to. LaPenne Dep. 24:7-9.

355.  Plaintiff LaPenne's arrest prevented her from being a participant or observer in the day's "civil" political demonstrations. LaPenne Dep. 25:4-5.

356.  Plaintiff LaPenne characterized her arrest as a "totally unexpected" and "traumatic" event. LaPenne Dep. 25:4-5.

**Plaintiff A. Weisenhaus**

357.  Because of this incident, Plaintiff A. Weisenhaus is "unsure and uneasy about going back to protests or being involved in any kind of protest" because she might "get arrested without having done anything to evoke that." A. Weisenhaus Dep.  24:10-14.

358.  Because of this incident, A. Weisenhaus is "conflicted about the role of police in general because I had never been in a prior conflict with police.  I had always thought they were . . . there to help you and I thought they were people I can trust and I remember after that event just feeling like I didn't really understand why all of these people got arrested that day and felt slightly less sure about police and their motives in general." A. Weisenhaus Dep.  24:23-25: 7.

359.  A. Weisenhaus's "life is different" because of her arrest and prosecution. A. Weisenhaus Dep. 28:24-29:1.

**Plaintiff C. Weisenhaus**

360.  C. Weisenhaus's arrest and processing distressed her and scared her, and she testified that "when I had pleaded for the looser cuffs, I am in their custody, and then being shut down by that police officer who said, I will tell you when they are too tight, while I was crying, I realized that, oh my God, I am not necessarily safe here. If they

are not going to tend to . . . my injuries or my personal well-being, this is really scary for me." C. Weisenhaus Dep. 36:5-15.

361. C. Weisenhaus was horrified by an event in her jail cell before she was released, in which officers demanded the shirt from a woman, who was screaming and saying she would not give them her shirt, and officers said "there is an easy way and a hard way. You either take it off or we'll take it off by force," and C. Weisenhaus could not do anything because she was locked up. C. Weisenhaus Dep. 36:16- 37:7.

362. Because of this incident, C. Weisenhaus no longer has the trust for the NYPD or people who should thought were there to protect her. C. Weisenhaus Dep. 37:10-14.

**Plaintiff MacLean**

363. Plaintiff MacLean testified that she suffered damages because her arrest and detention was illegal and unconstitutional. MacLean Dep. 103:3-24.

### NYPD Disorder Control Unit Deposition

364. Deputy Inspector Anthony J. Raganelli, Commanding Officer of the NYPD's Disorder Control Unit ("DCU"), testified on behalf of Defendant City of New York pursuant to Fed.R.Civ.P. 30(b)(6) regarding Defendants' crowd control policies and practices. Raganelli Dep. 4:9, 6:2-6, 7:14-21.

365. In connection with crowd and disorder control, the DCU provides logistical support to the Incident Commander, including various types of crowd control equipment and devices. Raganelli Dep. 39:12-18.

366. Orange barrier mesh netting is included among equipment that the DCU makes available to an Incident Commander. Raganelli Dep. 45:6-10; 45:19-46:5.

367. According to DI Raganelli, orange barrier mesh netting is useful "to redirect crowds, create areas of either places for people to congregate or create areas to deny access to a certain area." Raganelli Dep. 46:6-14.

368. According to DI Raganelli, orange barrier mesh netting can be used to create a physical barrier that opens up part of the sidewalk, allowing other parts of the sidewalk to be used for protest, similar to the manner in which tape at a crime scene might be used to the same effect. Raganelli Dep. 76:15-77:11.

369. DI Raganelli testified that, if verbal communication is not effective "to communicate to the crowd what we need to do and where we need them to go" police sometimes use netting "to set up lines to distinguish" for demonstrators "'That's where I have to be.'" Raganelli Dep. 78:11-79:3.

370. DI Raganelli testified that metal barricades could also be used to the same purpose "to actually set up an area within sight or sound of what it is that they're demonstrating against to give them a location that would allow them their freedom of expression while at the same time allowing other people that are uninvolved free passage on the sidewalk." Raganlli Dep. 79:3-10.

371. According to DI Raganelli, using orange barrier mesh netting to move a crowd of people if "the temperament of the crowd" is such that it "has a tendency or… could be tumultuous in some way" creates a situation that is not "tactically safe" for the officers. Raganelli Dep. 48:5-48:21.

372. Bullhorns are included among equipment that the DCU makes available to an Incident Commander. Raganelli Dep. 39:23.

373. According to DI Raganelli, there are circumstances when bullhorns are not effective in communicating with a crowd of people, "[d]epending on the background noise,

the size of the crowd, the distance that you're trying to…cover." Raganelli Dep. 43:3-11.

374. According to DI Raganelli, "it's important to communicate especially with large numbers of people that" the police are "trying to direct or move to a certain location or just communicate a message to." Raganlli Dep. 43:12-22.

375. According to DI Raganelli, bullhorns have an effective range beyond which they can't be reliably heard, but he did not know what the range was. Raganlli Dep. 44:20-45:1.

376. According to DI Raganelli, "[i]f the bullhorn is not effectively reaching all the individuals for whatever reason, it could potentially pose a safety…hazard of just lack of communication with the crowd." Raganlli Dep. 43:22-44:1.

377. Long Range Acoustic Devices ("LRADs") are among the crowd control equipment that the DCU makes available to an NYPD Incident Commander at a demonstration. Raganelli Dep. 41:1-43:2.

378. According to DI Raganelli, an LRAD is a "hailing device" that can be used "to communicate long distances to crowds." Raganelli Dep. 41:5-10.

379. According to DI Raganelli, LRADs can be used to communicate at a demonstration if necessary, depending on the "background noise" and the "environment" or "the situation that we may need to use it in." Raganeli Dep. 42:15-43:2; 44:2-19.

380. According to DI Raganelli, if a group of protesters were gathered in front of 60 Centre Street and 40 Centre Street such that there were protesters occupying the entire sidewalk from the building line to the curb, causing "a substantial disruption to people being able to use the sidewalk that aren't involved in the protest", the "first method" the police would use would be "communicating with [the demonstrators]

to open up the sidewalk and clear it for pedestrians that wanna [sic] use the sidewalk." Raganelli Dep. 72:15-19, 73:5-7, 74:9-25.

381. According to DI Raganelli, the "[s]econd step … depending on who …is … in charge of that location … may be to give a second request to move or may possibly move up to a situation where you need to warn them at this point that they need to move or be subject to arrest." Raganelli Dep. 76:9-14.

382. According to DI Raganelli, when protesters occupy the sidewalk "from building line to curb, closely-packed together" such that "an uninvolved … person who's merely walking down the sidewalk now has to go out into the street to go around this group to get back up to the sidewalk" the protesters are causing what the NYPD considers a "substantial disruption" of traffic. Raganelli Dep. 79:11-80:6.

383. DI Raganelli described "orders to disperse" as orders to "move from a location" given "in order to ensure safety and order." Raganelli Dep. 82:15-24.

384. According to DI Raganelli, as a "customary practice" the NYPD "give[s] …verbal warning instructing [protesters] on … whatever the statute or violation is that they're violating and given them an opportunity to move on." Raganelli Dep. 83:11-84:2.

385. DI Raganelli cited "if you're asking somebody to disperse from a location and they're not…substantially disrupting the free movement of pedestrians on the sidewalk" as an example of something that "could be an unlawful order." Raganelli Dep. 84:19-85:19.

DATED:     Brooklyn, New York
           February 13, 2017

                         /S/
           _____
           Gideon Orion Oliver
           Attorney for Plaintiffs
           277 Broadway, Suite 1501

New York, NY  10007
646-263-3495