UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Marilyn Collins et al.,

                              Plaintiffs,

              —v—

The City of New York et al.,

                              Defendants.

14-CV-08815 (AJN)

MEMORANDUM OPINION
AND ORDER

ALISON J. NATHAN, District Judge:

This case arises out of arrests following an Occupy Wall Street demonstration that occurred in 2011. Plaintiffs bring claims under 42 U.S.C. § 1983 alleging violations of their constitutional rights against the Defendants, who are officers with the New York Police Department and the City of New York. Defendants move for summary judgment on all claims. The Court grants summary judgment on nearly every claim but concludes that genuine issues of material fact remain regarding the claims of deprivation of a right to a fair trial brought by two of the Plaintiffs.

I.      Background

        A.      Demonstration and Arrests

On November 5, 2011 on Occupy Wall Street demonstration occurred in the area around the courthouse at 60 Centre Street and Foley Square in New York, New York. Pl. Affirmative 56.1 Statement ("Pl. 56.1"), Dkt. No. 102, ¶ 1; Def. 56.1 Statement ("Def. 56.1"), Dkt. No. 95, ¶¶ 1-2; Pl. Response to Def. 56.1 ("Pl. Resp."), Dkt. No. 103, Resp. 1, 2. Plaintiffs Shirazi, Heinz, LaPenne, Collins, A. Weisenhaus and C. Weisenhaus were participants in the

demonstration, and Plaintiff Maclean was a volunteer Legal Observer with the National Lawyers Guild – New York Chapter who was present during the demonstration. Pl. 56.1 ¶¶ 81-82; Pl. Resp. 1. Defendant Anger was the "NYPD Incident Commander in charge of subordinate officers policing the [Occupy Wall Street] demonstration" on November 5. Pl. 56.1 ¶ 1. Demonstrators formed a crowd on the sidewalk in front of 60 Centre Street but were kept off the steps of the courthouse by police officers issuing verbal warnings. Def. 56.1 ¶¶ 15-16, 18; Pl. Resp. 16, 18.

At approximately 3:00 p.m., Anger ordered subordinates, including Defendant Zielinski, to direct all people on the sidewalk in front of 60 Centre Street to leave the area or face arrest due to an alleged concern that demonstrators were obstructing the sidewalk and causing some pedestrians to walk in the roadway. Pl. 56.1 ¶¶ 8-9; Def. 56.1 ¶¶ 23, 26; Pl. Resp. 23, 26; Def. Response to Pl. 56.1 ("Def. Resp."), Dkt. No. 108, at 4. Video taken between 2:58 p.m. and 3:02 p.m. does not show any pedestrians being forced to walk in the roadway. Def. Ex. U, Dkt. No. 94-23, at 0:00-4:18; Pl. 56.1 ¶ 7; Def. Resp. at 4. Defendant Zielinski gave a warning at approximately 3:05 p.m. through a bullhorn, stating "Ladies and gentlemen my name is Lt. Zielinski, I am with the Manhattan South Task Force, you are blocking pedestrian traffic. I am ordering you to leave the sidewalk. If you do so voluntarily no charges will be filed against you. If you refuse to leave you will be placed under arrest and charged with disorderly conduct." Def. 56.1 ¶ 26; Pl. Resp. 26; Def. Ex. U at 6:35-7:00. The parties dispute whether all demonstrators were able to hear this order. Def. 56.1 ¶ 27; Pl. Resp. 26, 27. From video of the event, it appears that Defendant Zielinski's initial order was intermittently drowned out by the playing of harmonicas and shouts from the crowd. *See* Def. Ex. U at 6:47-50, 6:55-58. Defendant Zielinski thereafter read several orders telling the crowd to leave the area. Def. Ex. U at 8:00-15, 8:52-

9:10; Def. 56.1 ¶ 35; Pl. Resp. 35. The parties dispute whether Defendant Zielinski told the protestors that they were able to continue protesting across the street in Foley Square. Pl. 56.1 ¶¶ 13-14, 18; Def. Resp. at 5-7.

Following these orders by Defendant Zielinski, Defendant Cooke proceeded to walk through the crowd, issuing orders from a bullhorn that included "Folks we need you to clear the sidewalk, thank you. Folks you have to clear the sidewalk, thank you. Folks we have to clear the sidewalk thank you." Def. Ex. U at 10:09-10:25; Def. 56.1 ¶¶ 41-44; Pl. Resp. 41. An unidentified third officer issued orders from the courthouse steps, stating "folks you have to clear the sidewalk, thank you." Def. Ex. U at 10:55-11:36, 11:55-12:17; Def. 56.1 ¶ 45; Pl. Resp. 45.1. In response to these orders, the demonstrators began a chant of "We are pedestrian traffic." Def. Ex. U at 10:54-11:10; Pl. Resp. 46.

Over the following several minutes, officers gave a series of other warnings. Defendant Zielinski announced through a bullhorn "Ladies and gentlemen you're going to have to leave this area. Right now it's temporarily closed. Right now you have to leave the sidewalk. Right, because you're blocking the walkways, it's unsafe. You're blocking the walkway, you need to move. Right now it's a danger, it's a hazard, you need to move." Def. Ex. V, Dkt. No. 94-24, at 3:25-46; Def. 56.1 ¶ 48; Pl. Resp. 48. A few seconds later, Defendant Zielinski repeated "Ladies and gentlemen right now you need to clear the sidewalk, it's a hazard. You need to clear – it's temporarily closed, we don't want nobody to get hurt. Ladies and gentlemen, we need to you to move temporarily, start walking through, we don't want nobody to get hurt." Def. Ex. U at 12:13-23; Def. Ex. V at 4:00-15; Def. 56.1 ¶ 49; Pl. Resp. 49. Defendant Zielinski then announced "Ladies and gentlemen you need to clear the sidewalk. Right now it's temporarily closed, we don't want nobody to get hurt." Def. Ex. U at 12:25-31; Def. Ex. V at 4:29-35; Def.

3

56.1 ¶ 50; Pl. Resp. 50. Defendant Cooke announced through a bullhorn "Ladies and gentlemen you got to clear the sidewalk please. Ladies and gentlemen please clear the sidewalk, thank you. Ladies and gentlemen please clear the sidewalk." Def. Ex. U 12:37-51; Def. 56.1 ¶ 51; Pl. Resp. 51. He repeatedly ordered the sidewalks be cleared over the course of the next two minutes. Def. Ex. U at 12:58-14:37; Def. 56.1 ¶¶ 52-53, 62-63; Pl. Resp. 52, 53, 62, 63. Defendant Zielinski also made repeated announcements that the sidewalk was temporarily closed, and the demonstrators needed to "move on." Def. Ex. T, Dkt. No. 94-22, at 6:34-8:19 Def. Ex. U at 14:29-37; Def. Ex. V at 5:44-6:00; Def. 56.1 ¶¶ 58-59, 64-74; Pl. Resp. 58, 59, 64, 65, 66, 68, 69, 71, 72, 73, 74.

Defendant Zielinski attempted to confirm that officers standing near the back of the crowd could hear him before giving additional announcements. Def. Ex. U at 17:10-25, Pl. Resp. 83. Defendant Zielinski subsequently read an explicit arrest warning through a bullhorn, stating: "Okay, good afternoon ladies and gentlemen. My name is Lt. Zielinski and I am with the Manhattan South Task Force. You are obstructing pedestrian traffic and vehicular traffic. I am ordering you to leave this location. If you do so leave voluntarily no charges will be filed. If you do stay you will be charged with obstructing governmental administration and disorderly conduct." Def. Ex. U at 17:24-17:50; Pl. 56.1 ¶ 32; Def. 56.1 ¶ 84; Pl. Resp. 84. Shortly thereafter, Defendant Zielinski stated "Ladies and gentlemen, since you have refused to leave this roadway or sidewalk I am now ordering you arrest for the charge of disorderly conduct. If you interfere with an arrest and delay the opening of traffic or obstruct the roadway you will be charged with obstructing governmental administration. You will be fingerprinted and charged with the New York State Penal Law." Def. Ex. U at 18:06-18:31; Def. 56.1 ¶ 88; Pl. Resp. 88.

Defendant Zielinski then stopped in front of Plaintiffs A. and C. Weisenhaus, who were

4

standing in the Centre Street bike lane at the corner of Centre Street and Pearl Street, *see* Def. Ex. U at 18:44-46; Def. Ex. Y, Dkt. No. 104-27, at 2:20-45, and stated "Okay, you're going to have to leave or you're going to be arrested. Let's go, you have to leave." He then grabbed C. Weisenhaus and stated, "Put your hands behind your back." Def. Ex. U at 18:39-55; Pl. 56.1 ¶¶ 37-38; Def. 56.1 ¶¶ 90-91; Pl. Resp. 90, 91. Defendant Zielinski assigned the arrest of C. Weisenhaus to Defendant Walker. Pl. 56.1 ¶ 39; Def. 56.1 ¶ 206; Pl. Resp. 206. Defendant Zielinski ordered Defendant Li to arrest A. Weisenhaus. Def. 56.1 ¶ 194; Pl. Resp. 194. Plaintiff C. Weisenhaus told the arresting officers that she had been confused by the police officers, and the officer responded either that she should not have been arrested or that the officer was not sure why she had been arrested. Pl. 56.1 ¶¶ 43-44; Def. Resp. at 15.

Defendant Zielinski again told the crowd that if they did not leave, they would be arrested. Def. Ex. U at 19:00-05; Def. 56.1 ¶ 94, Pl. Resp. 94. Plaintiffs Collins and LaPenne attempted to cross Centre Street to Foley Square to comply with the police orders. Pl. 56.1 ¶ 46. Either Defendant Zielinski or another officer then arrested Plaintiff LaPenne as she stood in the crosswalk at approximately 3:28 p.m. Def. Ex. U at 19:55; Def. Ex. W, Dkt. No. 94-25, at 1:42-58; Pl. 56.1 ¶ 48; Def. 56.1 ¶¶ 95, 175; Pl. Resp. 95, 175; Def. Resp. at 16.

Plaintiff Collins was arrested in the same crosswalk as Plaintiff LaPenne. Def. Ex. W at 1:51-59; Pl. 56.1 ¶ 47; Def. 56.1 ¶ 95. She was arrested by Defendant Zielinski and handed over to Defendant Sharma, who had observed Collins for a couple minutes prior to her arrest and who had asked Collins to "move along." Def. Ex. L ("Sharma Dep."), Dkt. No. 94-12, p. 68 ln. 3-22; Def. 56.1 ¶ 147; Pl. Resp. 147. Plaintiff Collins was arrested at approximately 3:30 p.m. Def. 56.1 ¶¶ 147-48; Pl. Resp. 147, 148.

Defendant Zielinski continued to repeat warnings that demonstrators needed to leave or

5

they would be arrested after Collins was arrested. Def. Ex. U at 20:05-21:54; Def. Ex. W at 1:58-2:16; Def. 56.1 ¶¶ 96-97; Pl. Resp. 96, 97. Police then attempted to close the Pearl Street alley by expanding an orange mesh barrier from the edge of the 60 Centre Street block across Pearl Street to the northern edge of the Thurgood Marshall U.S. Courthouse. Pl. 56.1 ¶ 59. Officers told individuals standing in the Pearl Street alley "Get back on the sidewalk," referring to the sidewalk in front of the Thurgood Marshall U.S. Courthouse. Pl. 56.1 ¶¶ 60-61.

Plaintiff Shirazi was placed under arrest shortly thereafter while standing on the sidewalk near the Thurgood Marshall U.S. Courthouse. Def. Ex. U at 22:28-23:22; Def. 56.1 ¶ 98; Pl. Resp. 98. Prior to Plaintiff Shirazi's arrest, an officer present named Lieutenant Albano observed officers attempting to clear the sidewalk where Plaintiff Shirazi stood and saw her refuse to leave despite multiple warnings. Def. Ex. D ("Albano Dep."), Dkt. No. 94-4, at p. 17 ln. 24 – p. 18 ln. 15; Def. 56.1 ¶¶ 125-26; Pl. Resp. 125, 126. Defendant Louie observed Defendant Zielinski give multiple warnings over a bullhorn before Louie was told to arrest Plaintiff Shirazi. Def. 56.1 ¶ 133, Pl. Resp. 133. Defendant Louie was ordered to arrest Plaintiff Shirazi and subsequently did. Def. 56.1 ¶¶ 138, 141; Pl. Resp. 138, 141. Defendant Louie stated that he saw Plaintiff Shirazi in the crowd that had just been repeatedly told by Defendant Zielinski to move but that he did not remember seeing her receive an individualized warning to move. Def. Ex. N ("Louie Dep."), Dkt. No. 94-14, at p. 69 ln. 14 – p. 70 ln. 22. Plaintiff Shirazi was shocked at being grabbed from behind and initially attempted to fight herself free. Pl. 56.1 ¶¶ 67, 69; Def. Resp. at 21-22. According to the Plaintiffs, Defendant Louie twisted Plaintiff Shirazi's arm behind her back. Pl. 56.1 ¶¶ 72, 75; *see* Def. Ex. X at 0:16-19; Def. Ex. Y at 8:45-50, 9:10-30. Plaintiff Shirazi cried that Defendant Louie was hurting her. Pl. 56.1 ¶ 76.

Plaintiff Heinz was arrested in the vicinity of Plaintiff Shirazi and around the same time

as Plaintiff Shirazi was arrested, although the parties dispute whether it occurred before or after Plaintiff Shirazi was arrested. Pl. 56.1 ¶¶ 79-80; Def. 56.1 ¶¶ 99-100; Pl. Resp. 99, 100; *see also* Ex. Y at 8:36-58. Lieutenant Albano observed officers attempting to clear the sidewalk where Plaintiff Heinz stood. Def. 56.1 ¶¶ 125; Pl. Resp. 125. Defendant Delgado observed Heinz sporadically for approximately five to ten minutes before her arrest and observed her being in a crowd that refused to comply with an order to leave after Defendant Zielinski had repeatedly instructed the group to leave via bullhorn. Def. Ex. M. ("Delgado Dep."), Dkt. No. 94-13, at p. 43 ln. 15-20, p. 53 ln. 4-11; Def. 56.1 ¶¶164-65; Pl. Resp. 164, 165. Defendant Zielinski then ordered Defendant Delgado to arrest Plaintiff Heinz. Def. 56.1 ¶ 163; Pl. Resp. 163. Defendant Delgado arrested Plaintiff Heinz at approximately 3:30 p.m. Def. 56.1 ¶ 169; Pl. Resp. 169.

Defendant Zielinski then repeated that the demonstrators needed to "move on." Def. 56.1 ¶ 101; Pl. Resp. 101. Plaintiff MacLean stopped to take photographs while proceeding south past Defendant Zielinski and away from the area in front of the Thurgood Marshall U.S. Courthouse, and she was placed under arrest. Def. Ex. U at 22:50-23:17; Pl. 56.1 ¶¶ 88-89; Def. 56.1 ¶¶ 102-03; Pl. Resp. 102, 103. MacLean was arrested by Defendant Delgado, on Defendant Zielinski's order, at approximately 3:32 p.m. Def. Ex. U at 23:03; Delgado Dep. at p. 40, ln. 3-25, Def. 56.1 ¶¶ 182-85; Pl. Resp. 182. Plaintiff MacLean was wearing a bright green hat and badge to clearly identify herself as a volunteer legal observer. Pl. 56.1 ¶ 81. Delgado recognized the green hat as an indication that she was a legal observer. Pl. 56.1 ¶ 92; Def. Resp. at 28. Defendant Delgado remembered seeing Plaintiff Maclean receive a specific warning prior to her arrest. Delgado Dep. at p. 49, ln. 2-12.

### B. Plaintiff Shirazi's Handcuffs

After Plaintiff Shirazi was arrested, she was placed in handcuffs, and she told an officer –

Lieutenant Albano – that the handcuffs were hurting her because they were too tight. Def. 56.1 ¶ 113; Pl. Resp. 113. Lieutenant Albano asked an officer to remove her handcuffs. Def. 56.1 ¶ 114; Pl. Resp. 114. Plaintiff Shirazi's handcuffs were eventually cut off; while Plaintiff Shirazi does not recall how long it took for the cuffs to be removed, she estimated it was approximately seven to ten minutes. Def. 56.1 ¶¶ 115-16; Pl. Resp. 115, 116. Shirazi experienced pain, swelling, and bruising in her right hand. Def. 56.1 ¶ 117; Pl. Resp. 117. Shirazi did not seek medical attention while in police custody, but after her release, she put ice on her hand and took Aleve at a doctor's suggestion. Def. 56.1 ¶¶ 118, 120-21; Pl. Resp. 118, 120, 121. Plaintiff Shirazi estimated that the swelling in her hand lasted for approximately one week. Def. 56.1 ¶ 122; Pl. Resp. 122.

### C. Prosecutions

All of the Plaintiffs were subsequently detained for a period of hours before being issued desk appearance tickets. Def. 56.1 ¶¶ 119, 158, 170, 179, 187, 199, 212. Plaintiff LaPenne learned on January 10, 2012 that the District Attorney's office had declined to prosecute her. Pl. 56.1 ¶ 149. All other Plaintiffs were charged with disorderly conduct in violation of New York Penal Law §§ 240.20(5) and 240.20(6). Pl. 56.1 ¶¶ 112, 131, 140, 156, 166, 173. Plaintiff Shirazi was required to appear in court nine times before her case was dismissed on speedy trial grounds. Pl. 56.1 ¶¶ 113, 115. Plaintiff Collins was required to appear in court eight times before her case was also dismissed on speedy trial grounds. Pl. 56.1 ¶¶ 132, 134. Plaintiff Heinz was required to appear in court eight times before her case was dismissed on speedy trial grounds. Pl. 56.1 ¶¶ 141, 143. Plaintiff MacLean was required to appear in court twice before the prosecutor moved to dismiss the case because it could not be proven beyond a reasonable doubt. Pl. 56.1 ¶¶ 157-58. Plaintiff A. Weisenhaus was required to appear in court five times

before she accepted an adjournment in contemplation of dismissal. Pl. 56.1 ¶ 168-69. Plaintiff C. Weisenhaus was required to appear in court five times before she likewise accepted an adjournment in contemplation of dismissal. Pl. 56.1 ¶ 175.

### D.    Present Litigation

On November 5, 2014, the Plaintiffs initiated the present action by filing a complaint alleging violations of numerous constitutional rights. *See* Complaint, Dkt. No. 1. The parties then engaged in discovery over the course of a year and a half. On December 15, 2016, Defendants filed for summary judgment. Mot. for SJ, Dkt. No. 69. Following briefing, the Court administratively denied the motion and ordered the motion to be briefed by the parties in accordance with the Court's Individual Rules and the Local Civil Rules. Memo. & Order, Dkt. No. 92. Defendants filed a second motion for summary judgment on all of Plaintiffs' claims on July 14, 2017. Mot. for SJ, Dkt. No. 93.

## II.    Legal Standard

Summary judgment may not be granted unless all of the submissions taken together "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "Summary judgment is appropriate when 'the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Smith v. County of Suffolk*, 776 F.3d 114, 121 (2d Cir. 2015) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "[I]n making that determination, the court is to draw all factual inferences in

favor of the party against whom summary judgment is sought, viewing the factual assertions in materials such as affidavits, exhibits, and depositions in the light most favorable to the party opposing the motion." *Rodriguez v. City of New York*, 72 F.3d 1051, 1061 (2d Cir. 1995). However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

In seeking summary judgment, the initial "burden is upon the moving party to demonstrate that no genuine issue respecting any material fact exists." *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1223 (2d Cir. 1994). Where the non-moving party would bear the burden of proof at trial, "the burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the movant "demonstrates 'the absence of a genuine issue of material fact,' the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact" to survive summary judgment. *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (citation omitted) (quoting *Celotex Corp.*, 477 U.S. at 323).

## III. Discussion

### A. Summary Judgment Is Granted on Claims Abandoned by Plaintiffs

The Defendants argue that summary judgment should be granted on several claims that the Plaintiffs did not defend in their opposition to summary judgment. Reply Memo. ("Reply"), Dkt. No. 109, at 1. The Court agrees that the Plaintiffs have abandoned certain claims and that summary judgment on those claims is therefore appropriate.

"Federal courts may deem a claim abandoned when a party opposing summary judgment fails to address the [movant's] argument in any way. Accordingly, the Court dismisses these claims as abandoned." *Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003).

In the present case, Defendants move for summary judgment on all of Plaintiffs' claims. *See generally* Def. Memo. in Support of Mot. for SJ ("Support"), Dkt. No. 96. As relevant to the issue of abandonment, Defendants make several arguments to which Plaintiffs do not respond. First, Defendants argue that Plaintiffs' generic claim for "deprivation of federal civil rights" should be dismissed as either duplicative of other claims or because it is too general to give Defendants fair notice of the claims against them. Support at 3-4. As a result, Defendants are granted summary judgment on this claim.

Second, Defendants argue that the excessive force claim predicated on overly tight handcuffs should be dismissed as to all Plaintiffs. Support at 10-12. Plaintiffs only argue in their memorandum in opposition that a reasonable jury could find that Defendant Louie used excessive force against Plaintiff Shirazi. Pl. Memo. in Opp. to SJ ("Opp."), Dkt. No. 104, at 19-20. As a result, the Plaintiffs have abandoned any excessive force claim as to any other Plaintiff, and summary judgment is granted on this claim as to all Plaintiffs except Plaintiff Shirazi and as to all Defendants except Defendant Louie on the ground that the claims were abandoned.

Third, Defendants argue that they are entitled to summary judgment on Plaintiffs' selective enforcement claim because Plaintiffs have provided no evidence that they were treated differently than a similarly situated group of others as required to sustain a claim arising from the Equal Protection Clause. Support at 15-17 (citing *Deegan v. City of Ithaca*, 444 F.3d 135, 146 (2d Cir. 2006)). Plaintiffs do not respond to this claim in any way and do not argue that they can point to a similarly situated group of others to sustain their claim. As a result, the Court deems

11

this claim abandoned, and summary judgment is granted to Defendants.

Fourth, Defendants Zielinski and Anger argue that they are entitled to summary judgment on Plaintiffs' supervisory liability claims based on their direction or supervision of other Defendants at the scene or their failure to intervene because a constitutional claim requires personal involvement and an opportunity to intercede. Support at 17-18 (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)). Plaintiffs do not respond to this argument or provide any legal support or factual support for a claim of supervisory liability or failure to intervene as to Defendants Zielinski or Anger. As a result, summary judgment is granted to the Defendants on these abandoned claims.

Fifth, Defendants argue that the Plaintiffs' *Monell* claim should be denied because the Plaintiffs have not identified any actual policy or custom that existed and that, of the eight theories alleged in the complaint in support of *Monell* liability, Plaintiffs have not adduced any record evidence to support either that these policies existed or that the policies violated any of the Plaintiffs' constitutional rights. Support at 20-25. Plaintiffs do not discuss their *Monell* claim in their opposition to summary judgment or explain what evidence exists that would support any theory of *Monell* liability at trial. The Court therefore concludes that the Plaintiffs abandoned their *Monell* claim and grants summary judgment to Defendants thereon.

Finally, Defendants argue that they are entitled to summary judgment on Plaintiffs' claim for malicious abuse of process because Defendants had probable cause to arrest the Plaintiffs and that Plaintiffs have not adduced evidence of one of the elements of a claim for malicious abuse of process – a collateral objective outside legitimate means of process. Support at 12-14 (citing *Savino v. City of New York*, 331 F.3d 63, 76 (2d Cir. 2003)). Plaintiffs do not respond to this argument or provide any evidentiary support for their malicious abuse of process claim in their

12

opposition to summary judgment. As a result, the Court concludes that the claim has been abandoned and that it is therefore appropriate to grant summary judgment to the Defendants on this claim.

**B.    Defendants Are Entitled to Qualified Immunity on Plaintiffs' First Amendment, First Amendment Retaliation, Wrongful Arrest, Malicious Prosecution, and Remaining Excessive Force Claims**

With respect to the remaining claims, Defendants argue that they are entitled to summary judgment on the basis of qualified immunity. Specifically, Defendants argue that they are entitled to qualified immunity on Plaintiffs' claims for violation of the First Amendment, First Amendment retaliation, unlawful arrest, malicious prosecution, excessive force, and violation of the right to a fair trial. The Court concludes that the Defendants are entitled to qualified immunity on Plaintiffs' claims of violation of the First Amendment, unlawful arrest, First Amendment retaliation, malicious prosecution, and excessive force.

"The doctrine of qualified immunity 'gives government officials breathing room to make reasonable but mistaken judgments' by immunizing them from suit for damages unless their conduct violated clearly established constitutional rights of which a reasonable person would have known." Memo. & Order ("*Mediavilla* Order") at 13-14, *Mediavilla v. City of New York*, No. 14-cv-8624 (VSB), Dkt. No. 91 (quoting *Stanton v. Sims*, 134 S. Ct. 3, 5 (2013)). "In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry. The first asks whether the facts, '[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a [federal] right[.]' . . . The second prong of the qualified-immunity analysis asks whether the right in question was 'clearly established' at the time of the violation." *Tolan v. Cotton*, 134 S. Ct. 1861, 1865-66 (2014) (first, second, third, and fourth alterations in original) (quoting *Saucier v. Katz*, 533 U.S. 194, 201

(2001)). For a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate" such that "every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

### 1.      Violation of the First Amendment

The Defendants are entitled to qualified immunity on the Plaintiffs' claim that Defendants violated their First Amendment rights by failing to narrowly tailor the orders to disperse and failing to provide alternative channels of protest.

"[C]ourts in this Circuit have recognized that 'spontaneous police order[s] to demonstrators to relocate can be viewed through the lens of time, place, and manner doctrine'" pertaining to the First Amendment. *Wiles v. City of New York*, No. 13-cv-2898 (TPG), 2016 WL 6238609, at *5 n.1 (S.D.N.Y. Oct. 25, 2016) (second alteration in original) (quoting *Akinnagbe v. City of New York*, 128 F. Supp. 3d 539, 548 (E.D.N.Y. 2015)). In other words, courts must determine whether police orders to disperse violated demonstrators' First Amendment rights as an unconstitutional restriction on the time, place, or manner of protest. A police order to disperse violates the First Amendment unless the reviewing court concludes that the order was "(1) content neutral, in that [it] target[ed] some quality other than substantive expression; (2) narrowly tailored to serve a significant governmental interest; and (3) permit[ted] alternative channels for expression." *Deegan*, 444 F.3d at 142.

The Court concludes that, accepting all facts in the light most favorable to the Plaintiffs,

the Defendants are entitled to qualified immunity because it was not clearly established that an order temporarily banning demonstrators from a densely crowded sidewalk violated the First Amendment.

To the contrary, numerous cases have found restrictions like the one at issue here constitutional. New York courts have held that an officer's order to demonstrators to move across the street or be arrested for disorderly conduct is a constitutional restriction on the time, place, or manner of protesting since at least 1971. *See People v. Pearl*, 321 N.Y.S.2d 986, 987-88 (App. Div. 1971) (per curiam). Moreover, "[u]nder New York's disorderly conduct statute, an order to disperse is lawful unless 'the order was purely arbitrary and not calculated in any way to promote the public order.'" *United States v. Nelson*, No. 10-cr-414 (PKC), 2011 WL 1327332, at *3 (S.D.N.Y. Mar. 31, 2011) (quoting *Crenshaw v. City of Mt. Vernon*, 372 F. App'x 202, 206 (2d Cir. 2010)). The Second Circuit has also held that creating a two-block "no-demonstration zone" in front of the 2004 Republican National Convention was a valid restriction on the time, place, or manner of public demonstrations because it served to further the city's "significant interest in keeping [the sidewalk] channel clear for pedestrians," *Marcavage v. City of New York*, 689 F.3d 98, 105 (2d Cir. 2012), it did not burden substantially more speech than was necessary to serve that goal, *id.* at 106, and it left open adequate alternative places to demonstrate several blocks from the Convention even though those locations were not "within 'sight and sound' of the intended audience" of Convention-goers, *id.* at 108. Finally, two courts in this district have concluded that the very orders at issue in the present case were constitutional restrictions on the time, place, or manner of the Occupy Wall Street demonstrations. *See Wiles*, 2016 WL 6238609, at *4-5 (concluding that the orders were narrowly tailored to ensure the free flow of pedestrian traffic and that Foley Square was a satisfactory alternative channel in which

"many protestors were able to continue to demonstrate"); *see also Mediavilla* Order at 23-24 (same).

In light of New York's longstanding jurisprudence holding that orders like those given by officers in this case are constitutional and the decisions of other courts in this district finding these exact orders constitutional – and in light of the Plaintiffs' failure to provide contrary case law[1] – the Court concludes that it was not clearly established on November 5, 2011 that the orders to disperse given by the Defendants violated the First Amendment. The Defendants are therefore entitled to qualified immunity on this claim.

### 2. Unlawful Arrest

The Defendants are entitled to qualified immunity on the Plaintiffs' claim of unlawful arrest.

"There can be no federal civil rights claim for false arrest where the arresting officer had probable cause" to effect the arrest. *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995). Probable cause, in turn, "is established 'when the arresting officer has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested.'" *Id.* at 119 (quoting *O'Neill v. Town of Babylon*, 986 F.2d 646, 650 (2d Cir.1993)). An officer need only have probable cause for one offense to arrest the individual regardless of what that person is ultimately charged with. *Marcavage*, 689 F.3d at 109 ("A Fourth Amendment claim turns on whether probable cause existed to arrest for any crime, not whether probable cause existed with respect to each individual charge."). "Even if probable cause to arrest is ultimately found not to

---

[1] In fact, the only argument that the Plaintiffs make specifically to the Defendants' defense of qualified immunity on *any* claim is that "Defendants have not shown each constitutional right as to which they claim qualified immunity was not clearly established." Opp. at 29.

have existed, an arresting officer will still be entitled to qualified immunity from a suit for damages if he can establish that there was 'arguable probable cause' to arrest." *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004). "Arguable probable cause" exists "if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Id.* (quoting *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991)). "Qualified immunity from suit for false arrest is in part, therefore, a matter of second-order reasonableness: an officer is immune if it was *reasonable* for him to believe, *reasonably*, that the plaintiff was breaking the law." *Posr v. Court Officer Shield No. 207*, 180 F.3d 409, 416 (2d Cir. 1999).

In this case, Defendants allege that probable cause existed to arrest the Plaintiffs for disorderly conduct in violation of New York Penal Law §§ 240.20(5) and 240.20(6). *See* Support at 6. Under section 240.20(5), "[a] person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof . . . [h]e obstructs vehicular or pedestrian traffic." Under section 240.20(6), "[a] person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof . . . [h]e congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse." Courts have found that officers have probable cause to arrest protesters for disorderly conduct under section 240.20(6) when the protesters were part of a group that received one or more warnings to disperse. *Heicklen v. Toala*, No. 08-cv-2457 (JGK), 2010 WL 565426, at *4 (S.D.N.Y. Feb. 18, 2010) ("At the time the police gave the order to disperse, the plaintiff was congregating with others and his refusal to comply with the police order gave the defendants probable cause to arrest him."); *see also Marcavage*, 689 F.3d at 110 (holding that officers had probable cause to

arrest demonstrators for a violation of N.Y. Penal Law § 195.05[2] who had received seventeen warnings by three different officers "to leave the no-demonstration zone").

The facts in this case, taken in the light most favorable to the Plaintiffs, are such that no rational trier of fact could find for the Plaintiffs. In particular, the facts demonstrate that at the very least, some officers of reasonable competence could find that probable cause existed to arrest each Plaintiff for disorderly conduct under both sections 240.20(5) and 240.20(6), and thus the Defendants are entitled to qualified immunity. *Escalera*, 361 F.3d at 743.

First, with respect to obstruction of traffic, all of the Plaintiffs were observed by Defendants either standing in or near a crowd obstructing pedestrian traffic in the vicinity of 60 Centre Street and, as a result, could have been interpreted by a reasonable officer as being a part of the crowd responsible for obstructing traffic. Def. Ex. U at 22:43-53 (MacLean); Def. Ex. W at 1:35-53 (LaPenne and Collins); Def. Ex. Y at 2:30-3:05 (A. Weisenhaus and C. Weisenhaus); Def. Ex. Z, Dkt. No. 104-28, at 2:35-3:14 (LaPenne); Def. 56.1 ¶¶ 13-16, 125-26, 164-65 (Shirazi and Heinz). Second, with respect to obstruction under section 240.20(6), the Defendants who arrested one or more of the Plaintiffs were aware that numerous warnings to leave the area had been given to the crowd by Defendant Zielinski, Defendant Cooke, and others over bullhorns. Pl. 56.1 ¶ 32; Def. 56.1 ¶¶ 26, 35, 41-44, 48-53, 58-59, 62-63, 64-74, 84, 88; Pl. Resp. 26, 35, 41-42, 44, 48, 49-53, 58-59, 62-66, 68-69, 71-74, 84, 88; Def. Ex. T at 6:34-8:19; Def. Ex. U at 9:35-10:25, 12:05-31, 12:37-45, 12:58-14:37, 17:30-55, 18:09-31; Def. Ex. V at

---

[2] "Criminal violations of NYPL sections 240.20(6) (Disorderly Conduct) and 195.05 (Obstruction of Governmental Administration) overlap to a large degree, because '[a]n officer has probable cause to arrest for obstructing governmental administration where a person refuses to comply with an order from a police officer.' However, violation of section 195.05 requires interference that is, a least in part, physical in nature." *Mediavilla* Order at 16 (citations omitted) (quoting *Marcavage v. City of N.Y.*, No. 05-cv-4949 (RJS), 2010 WL 3910355, at *10 (S.D.N.Y. Sept. 29, 2010)).

3:25-46, 4:00-15, 4:29-35, 5:44-6:00. These general warnings were sufficient for a reasonable officer to reasonably believe that all of the demonstrators were aware that they should leave the sidewalk and street areas around 60 Centre Street and the Thurgood Marshall U.S. Courthouse. As a result, the Defendants had arguable probable cause to arrest the Plaintiffs based on the reasonable belief that the Plaintiffs were refusing to comply with the orders to disperse that had been given. *See Heicklen*, 2010 WL 565426, at *4.

Plaintiffs dispute this conclusion, arguing that a reasonable jury could believe that the Plaintiffs could not hear the warnings given by officers. Opp. at 15. It is true that an officer can only be found to have arguable probable cause to arrest someone under section 240.20(6) if the officer had reason to believe that that person received an order to disperse before being arrested. *See Zellner v. Summerlin*, 494 F.3d 344, 375 (2d Cir. 2008) (holding that no arguable probable cause existed because there was no evidence in the record that any order to disperse had been given in the plaintiff's vicinity before he was arrested). However, in the present case, the number of warnings given to the crowd, the use of bullhorns to amplify the warnings, the amount of time over which warnings were given, and the fact that warnings were given by different officers while standing at different locations in the crowd all could have led a reasonable officer to conclude that the Plaintiffs had heard one or more order to disperse and refused to do so. A reasonable officer could also have concluded that everyone in the crowd was aware of the orders to leave because the crowd started cheering, in apparent response to the need to move to allow pedestrian traffic to use the sidewalk, "We *are* pedestrian traffic." Pl. Resp. 46 (emphasis added); Def. Ex. U at 10:54-11:10.

Even if these generalized warnings did not give the Defendants arguable probable cause, every arresting officers – or the officer who ordered the Plaintiffs to be arrested – saw all

19

Plaintiffs except Plaintiff LaPenne either receive a direct order or be in close proximity to an officer giving an order to leave. First, Defendant Zielinski gave an explicit order for demonstrators to leave while standing directly in front of Plaintiffs A. Weisenhaus and C. Weisenhaus before he ordered that the two women be arrested. Def. Ex. U at 18:39-55; Pl. 56.1 ¶¶ 37-38; Def. 56.1 ¶¶ 90-91; Pl. Resp. 90-91. As a result, reasonable officers in Defendant Zielinski's position could conclude that Plaintiffs A. Weisenhaus and C. Weisenhaus had heard his order to disperse and were refusing to comply in violation of New York Penal Law § 240.20(6). Second, Defendant Sharma stated that he personally ordered Plaintiff Collins to "move along" prior to arresting her. Sharma Dep. at p. 68 ln. 3-22; Def. 56.1 ¶ 147; Pl. Resp. 147. Third, Defendant Louie observed Plaintiff Shirazi in a crowd that received multiple orders to leave from Defendant Zielinski. Louie Dep. at p. 69 ln. 14 – p. 70 ln. 22. Defendant Delgado observed Plaintiff Heinz in a group that received repeated instructions from Defendant Zielinski to leave the area prior to arresting her. Delgado Dep. at p. 43 ln. 15-20, p. 53, ln. 4-11; Def. 56.1 ¶¶164-65; Pl. Resp. 164, 165. Defendant Delgado also saw Plaintiff MacLean receive a specific order to leave the area prior to arresting her. Delgado Dep. at p. 49, ln. 2-12. Finally, although no Defendant saw Plaintiff LaPenne receive a direct warning, she was in close proximity to Plaintiff Collins and was arrested near where Plaintiffs A. Weisenhaus and C. Weisenhaus had been arrested just moments before. Def. 56.1 ¶¶ 94-95; Pl. Resp. 94, 95. As a result, a reasonable officer could have reasonably concluded that Plaintiff LaPenne had heard the warnings given to Plaintiffs A. Weisenhaus and C. Weisenhaus, as well as the warning given to Plaintiff Collins.

Plaintiffs next dispute whether the orders given by Defendants Zielinski, Cooke, and others constituted "orders to disperse." Opp. at 14-15. However, reasonable officers could have

reasonably concluded that the demonstrators had been given orders to disperse, and therefore the Defendants are entitled to qualified immunity. Demonstrators were repeatedly told that they had to leave the area. First, they were told to "clear the sidewalk," which unambiguously required the demonstrators, including the Plaintiffs, to *leave* the sidewalk in front of 60 Centre Street entirely. Def. Ex. U at 9:35-10:25, 10:59-11:17, 12:05-23, 12:37-45, 12:58-14:37; Def. Ex. V at 4:00-15; Def. 56.1 ¶¶ 41-45, 49, 51, 52-53, 62-63; Pl. Resp. 41, 42, 44, 45, 49, 51, 52, 53, 62, 63. Demonstrators were also told "you're going to have to leave the area. Right now it's temporarily closed. . . . [Y]ou need to move." Def. Ex. V at 3:25-46; Def. 56.1 ¶ 48; Pl. Resp. 48. Demonstrators were then told that they had to "leave this location" or they would be "charged with obstructing governmental administration and disorderly conduct." Def. Ex. U at 17:30-17:55; Pl. 56.1 ¶ 32; Def. 56.1 ¶ 84; Pl. Resp. 84. In context, these orders were clearly orders to disperse, and a reasonable officer could reasonably conclude that there was probable cause to arrest demonstrators who did not comply by leaving the area.

Plaintiffs LaPenne, Collins, and MacLean also dispute that they were refusing to comply with the Defendants' orders to disperse by arguing that they were in the process of leaving the area when they were arrested. Pl. 56.1 ¶¶ 46-50, 88. However, all three were arrested after numerous warnings had been given and several minutes after Defendant Zielinski had informed the crowd that they had already committed disorderly conduct by refusing to leave up to that point and were therefore going to be arrested. *See* Def. Ex. U at 18:09-18:31; Def. 56.1 ¶ 88; Pl. Resp. 88. As a result, even if the Plaintiffs were in the process of leaving, a reasonable officer could conclude that there was probable cause to arrest all three Plaintiffs for having committed disorderly conduct notwithstanding their subsequent attempts to leave the area. *See Marcavage*, 689 F.3d at 110 (upholding arrests for disorderly conduct where plaintiffs "gravitated in the

general direction of the demonstration zone" but were nonetheless found "hostile and noncompliant" to officers' orders).

Lastly, Plaintiffs argue that the orders to disperse violated the First Amendment, as discussed above. Opp. at 7-11; *see also supra*. Orders to disperse "must be lawful before failure to obey it gives rise to liability" for committing the offense disorderly conduct. *Mediavilla* Order at 20. As a result, courts have considered whether officers' orders to disperse violated demonstrators' First Amendment rights before finding that officers had arguable probable cause to arrest the demonstrators. *See Wiles*, 2016 WL 6238609, at *4-6; *Mediavilla* Order at 22-24. As discussed above, reasonable officers in Defendants' positions could have determined that the orders to disperse were lawful. As a result, the Defendants had at least arguable probable cause to arrest the Plaintiffs for failing to comply with those orders.

For these reasons, the Court concludes that the Defendants are entitled to qualified immunity on Plaintiffs' wrongful arrest claim.

### 3.    First Amendment Retaliation

To the extent Plaintiffs raise a claim for First Amendment retaliation separate from their other First Amendment claim, Defendants are likewise entitled to qualified immunity on the retaliation claim.

To state a claim for First Amendment retaliation, a plaintiff must establish that "1) he has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of his First Amendment right." *Kuck v. Danaher*, 600 F.3d 159, 168 (2d Cir. 2010) (quoting *Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001)). Under current Second Circuit precedent, the existence of probable cause is a complete defense to a claim of a

retaliatory arrest. *Fabrikant v. French*, 691 F.3d 193, 215-16 (2d Cir. 2012).

Because the Court has already concluded that the Defendants had arguable probable cause to arrest the Plaintiffs for disorderly conduct, *see supra*, the Court finds that the Defendants are entitled to qualified immunity on Plaintiffs' First Amendment retaliation claim on the basis of that same arguable probable cause.

### 4. Malicious Prosecution

Defendants are likewise entitled to qualified immunity on Plaintiffs' malicious prosecution claim because they had arguable probable cause to arrest each Plaintiff.

To make out a claim for malicious prosecution under § 1983, a plaintiff must prove four elements: "1) that the defendant initiated a prosecution against the plaintiff, (2) that the defendant lacked probable cause to believe the proceeding could succeed, (3) that the defendant acted with malice, . . . (4) that the prosecution was terminated in the plaintiff's favor," and "that there was (5) a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." *Rohman v. NYCTA*, 215 F.3d 208, 215 (2d Cir. 2000) (quoting *Posr*, 180 F.3d 417). In the present case, the Plaintiffs only allege a claim under § 1983.[3] "The existence of probable cause will defeat a claim of malicious prosecution and unreasonable search and seizure." *Fabrikant*, 691 F.3d at 215. In a malicious prosecution claim, defendants "must have

---

[3] Because Plaintiffs list as their first claim "Deprivation of Rights Under the U.S. Constitution," which includes "[f]reedom from malicious prosecution," Complaint at 14-15, then separately list as an eighth cause of action "malicious prosecution," Complaint at 19, it is ambiguous whether the latter is intended to be a state law claim. However, in the Plaintiffs' complaint, they do not state any source of law other than § 1983 giving rise to their claims. *See* Complaint at 3, 14, 19. The only statutory provisions the Plaintiffs identify as creating jurisdiction for this Court are provisions covering federal claims of action. Complaint at 3 (citing 28 U.S.C. §§ 1331, 1343(a)(3)-(4)). And in their memorandum in opposition to summary judgment, the Plaintiffs cite only the standard that applies to federal claims for malicious prosecution. *See* Opp. at 25. As a result, the Court concludes that the Plaintiffs have only alleged a federal claim for malicious prosecution.

had probable cause for each charge for which Plaintiff was prosecuted." *Rodriguez v. N.Y.C. Police Dep't*, No. 10-cv-891 (BSJ) (THK), 2011 WL 5057205, at *5 (S.D.N.Y. Oct. 24, 2011). An officer possesses "arguable probable cause to charge," and thus is entitled to qualified immunity on a malicious prosecution claim, "where, accounting for any new information learned subsequent to an arrest, 'it was not manifestly unreasonable for [the defendant officer] to charge [the plaintiff]' with the crime in question." *Jean v. Montina*, 412 F. App'x 352, 354 (2d Cir. 2011) (alterations in original) (quoting *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 572 (2d Cir. 1996)).

The Court has already concluded that the Defendants had arguable probable cause to arrest the Plaintiffs for disorderly conduct under both sections 240.20(5) and 240.20(6). Here, all of the Plaintiffs except Plaintiff LaPenne, who was never charged with a crime and thus cannot bring a claim for malicious prosecution, were charged with disorderly conduct under sections 240.20(5) and 240.20(6). Def. 56.1 ¶¶ 147, 169, 182, 193, 205, Pl. Ex. Nos. 30-42, Dkt. Nos. 101-30 to -42 (charging documents). Plaintiffs neither allege nor provide evidence demonstrating that any new information was learned by Defendants between the time of the Plaintiffs' arrests and the time they were charged. Plaintiffs therefore do not allege any reason why it became "manifestly unreasonable" for the Defendants to charge Plaintiffs with disorderly conduct. *See Jean*, 412 F. App'x at 354. As a result, the Court concludes that the Defendants had arguable probable cause to charge the Plaintiffs with disorderly conduct under sections 240.20(5) and 240.20(6), and that the Defendants are therefore entitled to qualified immunity on the claim of malicious prosecution.

### 5. Excessive Force (Defendant Louie)

Defendant Louie is entitled to qualified immunity as to the claim that he used excessive

force against Plaintiff Shirazi.

A person has a constitutional right to be free from the use of excessive force that is derived from the Fourth Amendment's protection against unreasonable seizure. *Graham v. Connor*, 490 U.S. 386, 394 (1989). "To succeed on a Fourth Amendment excessive force claim, a plaintiff must show that the amount of force used was 'objectively unreasonable.'" *Lowth*, 82 F.3d at 573 (quoting *Finnegan v. Fountain*, 915 F.2d 817, 821 (2d Cir. 1990)). To determine whether an officer's use of force was reasonable, courts must "consider the perspective of the officer at the time of the arrest, taking into account the fact that the officer may have been required to make a split-second decision." *Id.* When deciding whether an officer is entitled to qualified immunity for an excessive force claim, it is "especially important" that the law be clearly established with a high degree of "specificity" because "'[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts.'" *Mullenix*, 136 S. Ct. at 308 (first alteration in original) (quoting *Saucier*, 533 U.S. at 205).

In this case, Plaintiffs have put evidence into the record indicating that Defendant Louie twisted Plaintiff Shirazi's arm while he was subduing and arresting her, causing her to cry out in pain. Pl. 56.1 ¶¶ 72, 75-76; *see also* Def. Ex. X at 0:16-19 (not disproving that Plaintiff's arm was twisted); Def. Ex. Y at 8:45-50, 9:10-30 (same). In addition, evidence suggests that Defendant Louie put handcuffs on Plaintiff Shirazi that were too tight and were not taken off until approximately seven to ten minutes after she requested help. Def. 56.1 ¶¶ 113, 115-16; Pl. Resp. 113, 115, 116. Plaintiff Shirazi's hand subsequently swelled up and became bruised. Def. 56.1 ¶ 117; Pl. Resp. 117.

Based on this evidence, the Court concludes that Defendant Louie is entitled to qualified

immunity because no law clearly established that twisting an arrestee's arm to subdue her or tightly handcuffing her was unconstitutional. First, Plaintiffs have not identified any case establishing that twisting an arrestee's arm behind her back when she appears to be trying to escape from an officer constitutes excessive force. To the contrary, courts in this circuit determined that such actions were *not* unconstitutional in the years prior to the Occupy Wall Street demonstration held on November 5, 2011. For example, in *Bartlett v. City of New York*, the district court found that officers did not use objectively unreasonable force when they "grabbed [the plaintiff's] wrist and twisted her arm behind her back" while arresting her because she had "used her hands in an attempt to prevent the officers from walking into [her] apartment" and had made slight contact with an officer before he grabbed her arm. No. CV031961CPS, 2005 WL 887112, at *8-9 (E.D.N.Y. Feb. 11, 2005). Similarly, in *Kalfus v. New York & Presbyterian Hospital*, the district court concluded that it was not objectively unreasonable for officers to turn the plaintiff, "twisting his arms behind his back, pushing him face first onto the concrete slab, cuffing him, pinning his knee, and yanking his cuffed arms up with enough force to tear his right rotator cuff" because the officers had asked the plaintiff to stand up and put his hands behind his back and the plaintiff had responded "no." 706 F. Supp. 2d 458, 472 (S.D.N.Y. 2010). As a result, it would not be unreasonable for an officer in Defendant Louie's position to believe that he was using appropriate force when he twisted Plaintiff Shirazi's arm behind her back when she appeared to be resisting arrest. Defendant Louie is therefore entitled to qualified immunity.

Second, no law clearly established that it was inappropriate to tightly handcuff an arrestee at the time of Plaintiff Shirazi's arrest. Rather, "there is a consensus in the case law that tight handcuffing does not constitute excessive force unless it causes injuries beyond pain and

bruising." *Higginbotham v. City of New York*, 105 F. Supp. 3d 369, 377 (S.D.N.Y. 2015) (collecting cases); *see also Sachs v. Cantwell*, No. 10-cv-1663 (JPO), 2012 WL 3822220, at *15 (S.D.N.Y. Sept. 4, 2012) (holding that "[t]wenty-four hour swelling of the wrists does not rise to the level of injury necessary to sustain an excessive use of force claim for tight handcuffs"). Nor is there any evidence pointed to by the Plaintiffs to suggest that Plaintiff Shirazi complained immediately that her handcuffs were too tight. Rather, she complained several minutes later to a different officer, and her handcuffs were loosened shortly thereafter. Def. 56.1 ¶ 113, 115-16; Pl. Resp. 113, 115, 116. As a result, a reasonable officer in Defendant Louie's position could have reasonably concluded that he had not used excessive force in tightly handcuffing Plaintiff Shirazi because he had not made the handcuffs so tight that they were likely to cause damage beyond swelling and bruising and because Plaintiff Shirazi did not immediately complain to him that they were too tight, and they were loosened soon thereafter. As a result, Defendant Louie is entitled to qualified immunity.

C. **Summary Judgment Is Granted on Plaintiffs' Fair Trial Claim Except for the Claims Against Defendants Louie and Li in Connection with the Charges Brought Against Plaintiffs Shirazi and A. Weisenhaus**

Defendants next move for summary judgment on Plaintiffs' claim alleging deprivation of a fair trial. The Court concludes that summary judgment is appropriate on this claim except for the conduct of Defendant Louie in connection with the charging of Plaintiff Shirazi and the conduct of Defendant Li in connection with the charging of Plaintiff A. Weisenhaus.

"When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983." *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 275 (2d

Cir. 2016) (quoting *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997)). Such

actions are considered "corruption of the truth-seeking function of the trial process." *Morse v.*

*Fusto*, 804 F.3d 538, 548 (2d Cir. 2015) (quoting *Ricciuti*, 124 F.3d at 130). Such fabrication

violates the right to a fair jury trial whether the officer fabricates tangible evidence or "the

officer's own account of his or her observations of alleged criminal activity, which he or she then

conveys to a prosecutor." *Garnett*, 838 F.3d at 274. "[T]he claim accrues when the officer

forwards the false information to the prosecutors." *Garnett v. Undercover Officer C0039*, No.

13-cv-7083 (GHW), 2015 WL 1539044, at *4 (S.D.N.Y. Apr. 6, 2015). A trial is not a

prerequisite to a claim: a plaintiff need only prove that she suffered a "deprivation of liberty

[that] is not 'too remote a consequence' of the act of creating the false information." *Dowling v.*

*City of New York*, No. 11-cv-4954 (NGG) (RML), 2013 WL 5502867, at *6 (E.D.N.Y. Sept. 30,

2013) (quoting *Powers v. Coe*, 728 F.2d 97, 105-06 (2d Cir. 1984)). Spending a number of

hours in jail has been found to constitute a sufficient deprivation of liberty, as has the obligation

to attend numerous follow-up court appearances. *See, e.g., Harris v. City of New York*, 222 F.

Supp. 3d 341, 351-52 (S.D.N.Y. 2016); *Dowling*, 2013 WL 5502867, at *7 (24-hour detention

followed by an adjournment in contemplation of dismissal); *Perez v. Duran*, 962 F. Supp. 2d

533, 542-44 (S.D.N.Y. 2013) (travel restrictions while released on plaintiff's own recognizance

and two court appearances).

Probable cause is not a defense to a claim for violation of the right to a fair trial. *Garnett*,

838 F.3d at 275. In addition, the Second Circuit has held that it was clearly established prior to

2007 that it was unconstitutional for a defendant to "knowingly fabricate[] evidence," thereby

denying the plaintiff a right to a fair trial. *Morse*, 804 F.3d at 550; *see also Harris*, 222 F. Supp.

3d at 352 (concluding that "no reasonable police officer could have thought that telling the

District Attorney's office that Plaintiff possessed the 'weapon' when the police had no such evidence was permissible"). As a result, the Second Circuit has denied qualified immunity to officers engaging in the falsification of evidence because "it was not 'objectively legally reasonable' for the defendants . . . to believe that it was permissible" to materially alter evidence. *Morse*, 804 F.3d at 550.

### 1. Defendants Are Not Entitled to Summary Judgment as to Plaintiff Shirazi

In making out the fair trial claim, Plaintiffs identify four allegedly false pieces of information that Defendant Louie provided to prosecutors via his arrest slips. Only the final piece of testimony is sufficient to establish a claim for denial of a right to a fair trial.

First, Plaintiffs state that Louie told prosecutors he "saw Shirazi standing and with a group of [at] least twenty-five others prior to her arrest, when he did not see her until seconds before her arrest." Opp. at 21. However, Plaintiffs fail to provide a reason to believe these pieces of information are inconsistent. Defendant Louie testified in his deposition that he recalled seeing Plaintiff Shirazi with a group of people but stated that he could not recall "a specific number" of people who were in the area. Pl. Excerpts of Louie Dep., Dkt. No. 101-23, at p. 73 ln 13-22. Even accepting Plaintiffs' version of the evidence, Defendant Louie could have – and testified that he did – see Plaintiff Shirazi with a group of individuals just prior to her arrest.

Second, Plaintiffs posit that Defendant Louie lied when he stated that "he arrested Shirazi in front of 60 Centre St., when in fact he arrested her in front of the Thurgood Marshall U.S. Courthouse." Opp. at 21. Even assuming that the Defendant lied about this piece of information, Plaintiff does not explain – and the Court can find no reason – why this fact would be "likely to influence a jury's decision" regarding Plaintiff Shirazi's guilt or innocence for

disorderly conduct. *See Garnett*, 838 F.3d at 275.

Third, Plaintiffs state that Defendant Louie lied by stating that he "observed Shirazi given and refuse multiple orders to disperse by Zielinski, when in fact he was not paying attention to Shirazi." Opp. at 22. However, Defendant Louie's deposition makes unmistakable that he saw Defendant Zielinski give several warnings to a group of people and immediately thereafter saw Plaintiff Shirazi as one person within that group. Louie Dep. p. 69 ln. 14 – p. 70 ln 17. This testimony is not inconsistent with the information given to prosecutors that "Lt. Zielinski ordered Protesters to disperse from the sidewalk numerous times via blowhorn." Shirazi DA Datasheet, Dkt. No. 101-46.

Finally, Plaintiffs point to Defendant Louie's statement that Shirazi was part of a group of "[a]pprox 25 people [who] were told numerous times to disperse, blocking sidewalk, unsafe, blocking pedestrians from walking." Shirazi DA Datasheet; *see also* Opp. at 22; Shirazi AI, Dkt. No. 101-51. Specifically, the Plaintiffs argue that Defendant Louie testified falsely when he wrote that Shirazi and the group she was with were ever seen blocking the sidewalk. In support of this argument, Plaintiffs point to Defendant Louie's deposition testimony, in which he stated that it was only the large initial group of people standing on the sidewalk in front of 60 Centre Street whom he saw blocking pedestrian traffic. Pl. Excerpts of Louie Dep. at p. 112 ln. 13 – p. 113 ln. 21. He further stated that he never saw Plaintiff Shirazi in this initial large group of people – he only saw her after the frozen area in front of 60 Centre Street had been established, and he only saw her in a smaller group of about twenty-five people, at which point he no longer saw any pedestrians blocked from walking on the sidewalk. Pl. Excerpts of Louie Dep. at p. 113 ln. 8-21. As a result, because the Court must make all available inferences in favor of the non-moving party, it follows that a reasonable jury could conclude that Defendant Louie lied about

seeing Plaintiff Shirazi in a group of people blocking pedestrian traffic.

Furthermore, Defendant Louie's testimony that he saw Shirazi in a group blocking traffic is the type of evidence "likely to influence a jury's decision." *Garnett*, 838 F.3d at 275. In fact, it was the only piece of evidence supporting a charge for disorderly conduct under N.Y. Penal Law § 240.20(5), which requires the State prove that a defendant "obstruct[ed] vehicular or pedestrian traffic."[4] Moreover, the eyewitness testimony of a police officer is information particularly likely to be believed by a jury. *See Garnett*, 838 F.3d at 275. As a result, a reasonable jury could conclude that Defendant Louie's statements caused Plaintiff Shirazi to suffer a restriction of liberty in the form of waiting three hours to be released on her own recognizance followed by nine follow-up court appearances. *See Harris*, 222 F. Supp. 3d at 351-52.

### 2. Defendants Are Entitled to Summary Judgment as to Plaintiff Collins

Defendant Sharma is entitled to summary judgment on the claim that he provided false information in connection with the arrest of Plaintiff Collins. Plaintiffs identify three statements on Plaintiff Collins's arrest slips that they allege are false. However, even drawing all available inferences in the light most favorable to the Plaintiffs, the Court concludes that there is no genuine issue of material fact as to whether Defendant Sharma gave false testimony that would support a claim for the denial of a right to a fair trial.

---

[4] In their reply memorandum, Defendants provide evidence demonstrating that Plaintiffs were observed receiving warnings from officers to disperse. Reply at 8-9. This argument only supports the conclusion that Defendants actually witnessed evidence supporting a charge under N.Y. Penal Law § 240.20(6), which pertains to disorderly conduct arising from an individual "congregat[ing] with other persons in a public place and refus[ing] to comply with a lawful order of the police to disperse." As a result, this evidence has no bearing on whether Defendant Louie testified falsely when he said that he witnessed Plaintiff Shirazi in a group that blocked pedestrian traffic or whether a jury would have been likely to rely on Defendant Louie's statement regarding the charged offense under section 240.20(5).

First, Plaintiffs argue that Collins provided false information when he stated that he observed Collins in front of 60 Centre Street when in fact he saw her closer to the front of the Thurgood Marshall U.S. Courthouse. Opp. at 22. For the reasons explained above, this is not a fact likely to influence a jury's decision in this case.

Second, Plaintiffs argue that Sharma lied when he stated on Plaintiff Collins's DA Datasheet that he saw Defendant Cooke give orders through a microphone but that the Plaintiff refused to disperse. Opp. at 22; *see also* Collins DA Datasheet, Dkt. No. 101-43; Collins AI, Dkt. No. 101-48. In his deposition, Defendant Sharma stated that he saw Defendant Zielinski rather than Defendant Cooke give orders to disperse in the area near Plaintiff Collins just before her arrest. *See* Pl. 56.1 ¶¶ 120, 122; Pl. Excerpts of Sharma Dep., Dkt. No. 101-24, at p. 71 ln. 6-23. He also testified in his deposition that he specifically gave Plaintiff Collins a warning to leave the area. Sharma Dep. at p. 68 ln. 3-22. As a result, even taking the version of facts most favorable to the Plaintiffs, in which Defendant Sharma fabricated information about Defendant Cooke giving warnings to Plaintiff Collins, there is no available inference that this testimony would have been "likely to influence a jury's decision" regarding Plaintiff Collins's guilt, *see Garnett*, 838 F.3d at 275, in light of his testimony about witnessing another officer give Plaintiff Collins instructions and testimony that he himself gave Plaintiff Collins a warning prior to arresting her.

Third, Plaintiffs argue that Defendant Sharma lied by stating on the arresting documents that pedestrians were forced to walk around the group that Plaintiff Collins was in. Opp. at 22; Collins DA Datasheet. However, the contradictory testimony to which Plaintiffs point does not allow the inference that Defendant Sharma lied. In his deposition, Defendant Sharma stated that the whole group was "blocking the way" and that he could not specifically identify any

pedestrian forced to walk in traffic because "everybody just walking everywhere. You didn't know who belonged to what, who was a pedestrian or who was part of the demonstration." Pl. Excerpts of Sharma Dep. at p. 83 ln. 11 – p. 84 ln. 11. While Sharma could not identify which individuals were pedestrians, no reasonable jury could conclude that he fabricated testimony by stating that any pedestrians who were present were forced to go around the large group blocking the sidewalk.

The Court notes that Plaintiffs raise several arguments that Officer Ciaramitaro may have falsified documents pertaining to Plaintiff Collins. Opp. at 22-23; Pl. 56.1 ¶¶ 126-31. However, Officer Ciaramitaro is not, and has never been, a defendant in this action. As a result, the Court does not consider Plaintiffs' evidence with respect to Officer Ciaramitaro.

### 3. Defendants Are Entitled to Summary Judgment as to Plaintiff Heinz

Defendant Delgado is entitled to summary judgment on the claim that he provided false information in connection with the arrest of Plaintiff Heinz. Plaintiffs identify two statements on Plaintiff Heinz's arrest slips that they allege are false. However, even drawing all available inferences in the light most favorable to the Plaintiffs, the Court concludes that there is no genuine issue of material fact as to whether Defendant Delgado gave false testimony that would support a claim for the denial of a right to a fair trial.

Plaintiffs make two insufficient arguments as to Defendant Delgado's allegedly falsified testimony regarding Plaintiff Heinz. First, Plaintiffs state that Defendant Delgado lied when he wrote on Plaintiff Heinz's DA Datasheet that she was in a group of "[a]pprox 25 people [who] were told numerous times to disperse, blocking sidewalk, unsafe, blocking pedestrians from walking." Heinz DA Datasheet, Dkt. No. 101-44; *see also* Opp. at 23; Heinz AI, Dkt. No. 101-49. Specifically, Plaintiffs state that this was a lie because during his deposition, Defendant

33

Delgado stated, "I don't remember her [Heinz] blocking pedestrians." Pl. Excerpts of Delgado Dep. at p. 55 ln. 8-9. However, in context, it is unmistakable that Defendant Delgado recalled the group in which Plaintiff Heinz was standing blocking traffic even if he did not see her individually stand in the path of a pedestrian. Just two pages before the exchange Plaintiffs excerpt, Defendant Delgado explained:

> Q. Did you see Ms. Heinz block traffic?
> A. Just pedestrian traffic.
> Q. What did you see with respect to her blocking pedestrian traffic?
> A. It was herself along with others blocking pedestrian traffic.

Pl. Excerpts of Delgado Dep. at p. 53 ln. 4-10. Defendant Delgado's two statements are consistent, and both are consistent with what he attested to in his official statement – that a group of approximately 25 people with whom Plaintiff Heinz was standing were collectively blocking traffic. *See* Heinz AI. As a result, no reasonable jury could conclude that Defendant Delgado gave false testimony to prosecutors when he made that statement.

Plaintiffs next state that Defendant Delgado lied when he attested that Defendant Zielinski ordered protesters to disperse from the sidewalk but that Heinz did not leave the area. Opp. at 23; Heinz AI; Heinz DA Datasheet. However, no reasonable jury could conclude that these statements were a lie. Plaintiffs identify Defendant Delgado's statements that he was "observing the whole crowd" and that in addition to Plaintiffs Maclean and Heinz, he was watching "[w]hoever was in that crowd behind the orange mesh" as evidence that he had not been observing Plaintiff Heinz and therefore could not know if she received warnings from Defendant Zielinski. Pl. Excerpts of Delgado Dep. at p. 40 ln. 21-22, p. 44 ln. 17-18; *see also* Opp. at 23. These statements are not contradictory, and Defendant Delgado stated affirmatively that he remembered seeing Plaintiff Heinz in the crowd that Defendant Zielinski ordered to leave. Pl. Excerpts of Delgado Dep. at p. 66 ln. 8-20.

### 4. Defendants Are Entitled to Summary Judgment as to Plaintiff LaPenne

Defendants are entitled to summary judgment on the claim that they denied Plaintiff LaPenne's right to a fair trial by making false statements to prosecutors regarding her arrest. The only allegedly false statements forwarded to prosecutors with respect to Plaintiff LaPenne were made by Officer Ciaramitaro. As discussed above, Officer Ciaramitaro is not a defendant in this case, and any evidence that he may have falsified arresting documents has no relevance to this case. As a result, the Defendants are entitled to summary judgment on this claim.

### 5. Defendants Are Entitled to Summary Judgment as to Plaintiff MacLean

Defendant Delgado is entitled to summary judgment on the claim that he provided false information in connection with the arrest of Plaintiff MacLean, thereby denying her right to a fair trial. Plaintiffs argue that Defendant Delgado provided false testimony as to Plaintiff MacLean when he stated that he observed her in a group that blocked pedestrians and was instructed by Defendant Zielinski to disperse, as well as stating that he saw Plaintiff MacLean not leave the area. Opp. at 24. In support of their argument that these statements were false, Plaintiffs point to statements Defendant Delgado made in his testimony that were nearly identical to the statements he made about Plaintiff Heinz. Pl. 56.1 ¶¶ 151, 153; *see also supra*. The reasons that no reasonable jury could conclude that Defendant Delgado lied with respect to Plaintiff Heinz are also the reasons that no reasonable jury could conclude that Defendant Delgado lied with respect to Plaintiff MacLean. Defendants are therefore entitled to summary judgment on this claim.

### 6. Defendants Are Not Entitled to Summary Judgment as to Plaintiff A. Weisenhaus

Defendant Li is not entitled to summary judgment on the claim that he provided false information in connection with the arrest of Plaintiff A. Weisenhaus. A reasonable jury could

conclude that Defendant Li provided false testimony to prosecutors, thereby denying Plaintiff A. Weisenhaus's right to a fair trial. Specifically, a reasonable jury could conclude that Defendant Li fabricated his testimony, written on Plaintiff A. Weisenhaus's arrest papers, that he saw Plaintiff A. Weisenhaus "blocking [the] street" and "blocking cars from driving." A. Weisenhaus DA Datasheet, Dkt. No. 101-47; A. Weisenhaus AI, Dkt. No. 101-50.

Plaintiffs identify several pieces of evidence tending to show that Plaintiff A. Weisenhaus was not blocking traffic and that Defendant Li never saw her blocking traffic. First, Plaintiffs identify numerous portions of Defendant Li's deposition transcript in which he repeatedly contradicts whether he can remember seeing A. Weisenhaus in the street or seeing cars avoiding her or whether he cannot remember anything about her arrest. *Compare* Pl. Excerpts of Li Dep., Dkt. No. 101-22, at p. 21 ln. 10-16 (remembering), *and* Pl. Excerpts of Li Dep. at p. 23 ln. 6-18 (same), *and* Pl. Excerpts of Li Dep. at p. 48 ln. 5-18 (same), *with* Pl. Excerpts of Li Dep. at p. 38 ln. 10-18 (not remembering), *and* Pl. Excerpts of Li Dep. at p. 43 ln. 10 – p. 46 ln. 9 (same), *and* Pl. Excerpts of Li Dep. at p. 48 ln. 19-24 (same). A jury could conclude from such evidence that Defendant Li's testimony is not trustworthy. In addition, Plaintiffs identify a video showing that when Plaintiff A. Weisenhaus was arrested, she was standing in a bike lane and not in the street blocking traffic. Pl. 56.1 ¶¶ 40-41; Def. Ex. W at 0:28-1:04. Plaintiff C. Weisenhaus also testified at her deposition that she and her sister were standing in the bike lane when they were both arrested. C. Weisenhaus Dep., Dkt. No. 101-7, at p. 24 ln. 4-17, p. 28 ln. 8-12.

As a result, taking all evidence in the light most favorable to the Plaintiffs, there remains a genuine issue of material fact as to whether Defendant Li lied about observing Plaintiff A. Weisenhaus in traffic. Defendant Li's testimony is evidence the jury likely would have relied on because it was the eyewitness testimony of an officer, it was the only evidence that linked

Plaintiff A. Weisenhaus with specifically blocking traffic instead of more generally being part of a group blocking the sidewalk, and there was no other evidence given to prosecutors pertaining to her blocking of traffic. Plaintiff A. Weisenhaus was detained for five hours and appeared five more times in court in connection with her desk appearance ticket. Pl. 56.1 ¶¶ 168-69. As a result, a reasonable jury could conclude that she suffered a deprivation of liberty as a result of Defendant Li's falsified statements. Summary judgment is therefore denied as to this claim.

### 7.    Defendants Are Entitled to Summary Judgment as to C. Weisenhaus

Plaintiffs argue that Defendant Walker testified falsely when he forwarded information to prosecutors that he observed Plaintiff C. Weisenhaus in a "group of approximately 100 to 200 individuals" and that "due to the presence of said group, the sidewalk was blocked, pedestrians could not walk on said sidewalk, and pedestrians were forced to walk into the street to get around said group." C. Weisenhaus AI, Dkt. No. 101-53; *see also* Opp. at 25. Plaintiffs argue that this information is false because Walker stated in his deposition that he could not recall the details of Plaintiff C. Weisenhaus's arrest and because she was arrested in a bicycle lane. Opp. at 25. No reasonable jury could conclude that either piece of evidence identified by Plaintiffs demonstrates that Defendant Walker testified falsely. In particular, Defendant Walker could have seen C. Weisenhaus in the group that was blocking the bike lane as the officers were trying to clear the sidewalk in front of 60 Centre Street. In fact, this is exactly what video evidence shows. Def. Ex. U at 16:53-18:00. As a result, no genuine issue of material fact exists as to whether Defendant Walker made any false statements to prosecutors in violation of Plaintiff C. Weisenhaus's fair trial right. Summary judgment is granted to Defendants on this claim.

For the foregoing reasons, summary judgment is granted on Plaintiffs' claims that the Defendants violated their right to a fair trial with respect to all Defendants except Defendants

Louie and Li.

**IV.     Conclusion**

Summary judgment is granted on all claims as to all Defendants except that summary judgment is denied on Count Nine with respect to Plaintiff Shirazi's claim against Defendant Louie and Plaintiff A. Weisenhaus's claim against Defendant Li.  All other parties are dismissed from the action.  This resolves Docket Number 93.  A post-discovery conference in this action will be scheduled under separate order.

SO ORDERED.

Dated: March 2⎵ 2018
New York, New York

ALISON J. NATHAN
United States District Judge